(No. 23793.—

THE PEOPLE *ex rel.* EDWARD J. HUGHES, Secretary of State, Appellee, *vs.* THE UNIVERSAL SERVICE ASSOCIATION, Appellant.

*Opinion filed February 12, 1937—Rehearing denied April 7, 1937.*

JUSTUS CHANCELLOR, for appellant.

OTTO KERNER, Attorney General, (M. RAYMOND WALLENSTEIN, of counsel,) for appellee.

Mr. JUSTICE FARTHING delivered the opinion of the court:

The circuit court of Cook county, having granted leave, the Attorney General, on the relation of Edward J. Hughes, Secretary of State, filed an information in the nature of *quo warranto* against the Universal Service Association, a non-profit corporation organized under the provisions of "An act concerning corporations," (32 S. H. A. 158; State Bar Stat. 1935, chap. 32, par. 159, p. 886.) The amended information charged the appellant, (herein-

after called respondent,) with conducting a business for pecuniary profit and carrying on activities which only a corporation for profit has the right to do. By stipulation of counsel, the issue was limited to whether respondent was doing business for profit as charged in the information. The judgment rendered, after a hearing, permitted respondent to carry on its educational work, but ousted it from its profit-making activities. A nominal fine was assessed, and this appeal followed.

The respondent was incorporated in August, 1933, as successor to the Citizens Universal Service Association, an Illinois corporation organized for profit. The Universal Service Association described itself as a "National University of Thought and Action to Teach and Demonstrate 'Plenocracy' in the daily lives of American citizens." Its activities embrace the giving of a course of instruction, and "demonstrating" its "technique." The respondent was ousted from the latter activity alone. The truth or fallacy of "Plenocracy" is not involved. It is described as "the philosophy of the power of plenty and the science of creating abundance for all." This theory was developed by respondent's president, Dr. Samuel Maxwell. It proposes a new economic order in which profit is to be eliminated, interest is to be prohibited and man is to live upon the product resulting from his intelligent coöperation with nature. This product is called "The natural increase." The educational system of respondent consists of twelve pamphlets or lessons, and three or four text-books written by Dr. Maxwell. The lessons are sent to the "Coöperators" or members throughout the United States. The "student coöperator" is charged nothing for the course of instruction and he may receive the lessons before or after he becomes a coöperator or investor in the "Universal Service Plan,"—*i. e.,* the practical demonstration of the system. The same course of instruction is given regardless of the amount "contributed" or invested. The litera-

ture is sent to the prospective coöperator so that he may become "attuned to the principle," and become interested in "contributing" his funds to the respondent, in order that a practical demonstration of the truth of the philosophy may be illustrated to him to his financial gain. There are no scholastic prerequisites to taking the course of instruction or to enrollment in the university. The actual business in which the coöperators invest their money, styled the "technique," was similar to that carried on by respondent's predecessor Citizens Universal Service Association. Respondent calls this "technique" the "Universal Service Plan." The coöperators make payments under one of four plans. Plan No. 1 is merely an introductory arrangement. The coöperator agrees to "contribute" a payment of five dollars to the university for extension work and to make twelve monthly payments. Two of the monthly payments are also to be used by the respondent for extension work and ten of them are designated as "contributions for natural increase." The "coöperator" or "contributor" was promised "a natural increase" of thirty per cent per annum and the surplus above that figure was to be donated to respondent for expenses and future extension work. The application for enrollment under all plans had a table of benefits based upon a thirty per cent per annum return on the amount invested or "contributed." Plan No. 2 was for those "coöperators" who wished to "contribute" or invest any amount from one dollar to twenty-five dollars per month over a period of five years. Plan No. 3 was designed for those who had savings of $700 to $22,000 and who wished to make a lump sum "contribution." On the back of this form it was stated that under this plan the "coöperator" could restore the depreciated value of his stocks, bonds and other investments and thereby lose nothing because of the economic depression. Plan No. 4 provided a monthly income for the coöperator. An analysis of the tables of "natural

increase" attached to each plan shows that the respondent represented that the coöperator would receive a thirty per cent cash dividend annually or one hundred and fifty per cent cash dividend, plus the principal investment at the end of five years of coöperation. A third option provided that the coöperator might take his profit in land instead of money at the end of five years. Upon selecting and signing one of the four forms the "coöperator" received a certificate of enrollment. Under Plans Nos. 2, 3, and 4, he could designate any product, trade or business in which he wished to see "Plenocracy" demonstrated, but one hundred coöperators had to designate the same thing before the project would be undertaken. In the meantime he would be paid thirty per cent per annum on his "contributions" from the natural increase in other projects. The thirty and one hundred and fifty per cent returns form the chief attractions in respondent's literature. The "contributors" had no voice in the management of respondent. There were no annual meetings of members or stockholders; no means was provided for the removal of the present management, and the board of trustees filled its own vacancies. Its only regular members were the three incorporators who were not "contributors" and who paid no dues.

Respondent's books of account were audited under an order of the circuit court. This disclosed that respondent was insolvent, and that there was nothing to repay the contributors. The natural increase or dividend payments had been made from capital funds. The audit also showed that respondent operated three farms at a loss, one at Princeton, another at Downers Grove, in Illinois, and a third at Chesterton, Indiana. Each was operated by a resident farmer on a share-crop arrangement. This system of operation bore no relation to the concepts of Plenocracy. Only a few of the coöperators, who numbered about one thousand, ever visited the farms. Their only

function was to make contributions and to receive natural increase checks from respondent.

The respondent contends that it is a charitable organization, and as such is not engaged in business for pecuniary profit. It contends that it has power to accept gifts for the promotion of education and the teaching of Plenocracy, to maintain a coöperative association, and to teach brotherly love and proper living. It insists that charitable gifts are favored and that this court will uphold them if possible. We reviewed the principles controlling charitable uses and charities in *People* v. *Y. M. C. A.*, (*ante,* p. 118,) and need not re-state them here. Appellant's contention is based upon a technical and artificial definition of commonly accepted words. For example it is contended that a coöperator is not an investor; that the contributions made by the coöperators are not investments, and that "the natural increase" from the money "contributed" is not a profit or a dividend. It is further contended that the coöperators are not in the position of stockholders receiving dividends, but that they have contributed their money to be used for educational and charitable purposes for a period of time, and which is to be returned with a "natural increase" of thirty per cent per annum. The scheme, when reduced to its essentials, is a business arrangement designed to produce a profit. There is no material difference between respondent and a corporation organized under the Business Corporation act, with a board of directors, officers, stockholders and provisions for stockholders meetings and control over the management of the corporation. To permit respondent to thus evade the strict supervision imposed by the Business Corporation act would be sacrificing substance to form. In *Santa Clara Female Academy* v. *Sullivan,* 116 Ill. 375, 387, in a similar connection we held that pecuniary profit means for the profit of stockholders or members. But in that case the corporation was devoting all its money to educational pur-

poses, and we held that it was not a corporation for pecuniary profit. *Read* v. *Tidewater Coal Exchange*, 13 Del. Ch. 195, 116 Atl. 898, states the difference between corporations for profit and not for profit, as follows: "Whether dividends are expected to be paid may, generally speaking, be taken as the test by which we are to determine whether, or not, a given corporation is organized for profit. Perhaps a better way to put it would be to say that a corporation is for profit when its purpose is, whether dividends are intended to be declared or not, to make a profit on the business it does which in reason belongs to it and which if its affairs are administered in good faith would be available for dividends. Subterfuges by which a corporation allowed its profits to be diverted to those owning it, though not in the form of dividends, would manifestly not remove from the corporation its feature of profit making. Nor would a mere declaration in its certificate of incorporation that it was organized not for profit be sufficient to stamp upon it a non-profit character. In each case, when the corporation is examined, the true facts must be ascertained and the corporation judged accordingly, no matter what its scheme of operation, or its pretentions may be. Such being true, the State is always protected against schemes to evade franchise taxes, first by the inspection which the corporation must undergo before the Secretary of State, and secondly by the writ of *quo warranto* which the State may always employ to oust a corporation for abuse of its franchise."

The respondent's educational objects are incidental to its main object of demonstrating the actual technique of its theory and thereby earning for the investors a very substantial "natural increase" which if earned and paid by a corporation for profit would be called a dividend. It was not until after the profit exceeded thirty per cent that the respondent was to share in the "natural increase." The "contributors" are nothing more than stockholders who

have been induced to invest their money on the prospect of large returns. The educational features are not emphasized in the advertising of respondents, and they need not be, when such financial returns are promised. The chancellor was correct in holding that respondent was engaging in a business for profit and in ousting it from the exercise of such powers.

Appellant contends that since it was given the power by its charter to return, pro rata, the contributions and funds received from its operations and not used in carrying out its objects and purposes, and also the power to make practical demonstrations of the division of the increase created by the coöperative effort of its students and patrons, it is not exceeding its charter powers, and cannot be ousted by *quo warranto*. We need not decide whether the power to carry on the business done by respondent can be implied from language so vague, because the Corporation act determines the limits of the power that may be granted under it. The Secretary of State in issuing a charter acts in a ministerial capacity, and all powers granted beyond the statute are void. (*People* v. *Chicago Gas Trust Co.*, 130 Ill. 268.) Section 33 of the act regulating corporations not for profit forbids the payment of dividends or the distribution of the property of such a corporation except after all debts are fully paid and then only upon final dissolution. The power conferred by respondent's charter could well be limited to a return of contributions upon final distribution instead of an attempt to confer power to declare dividends. In any event the charter could not go beyond the terms of the act, and a provision for payment of dividends or "natural increase" would be void.

Respondent contends that *quo warranto* is not the proper remedy and that the court erred in not dismissing the information when it introduced its charter in evidence and showed that it was organized for charitable purposes.

All questions of pleading were waived by the stipulation that the case should be considered at issue on the question of whether respondent was engaged in a business for profit. We will, therefore, not consider the errors urged in that regard.

The judgment of the trial court is correct, and it is affirmed.

*Judgment affirmed.*