Walton Playboy Clubs, Inc., Plaintiff-Appellee, Cross-Appellant, v. City of Chicago, a Municipal Corporation, Richard J. Daley, Mayor and Liquor Control Commissioner of the City of Chicago, Orlando W. Wilson, Superintendent of the Police of the City of Chicago, Defendants-Appellants, Cross-Appellees.

Gen. No. 48,627.

First District, Third Division.

October 10, 1962.

Maurice Rosenfield and Devoe, Shadur, Mikva & Plotkin, of Chicago (Harry Kalven, Jr. and Milton I. Shadur, of counsel), for plaintiff-appellee and cross-appellant.

John C. Melaniphy, Corporation Counsel, of Chicago (Sydney R. Drebin and Robert J. Collins, Assistant Corporation Counsel, of counsel), for defendants, appellants and cross-appellees.

MR. PRESIDING JUSTICE DEMPSEY delivered the opinion of the court.

This is an appeal by the City of Chicago from a declaratory judgment granted the plaintiff, the Walton Playboy Clubs, Inc. The plaintiff cross-appeals from part of the judgment order and from the denial of its prayer for an injunction.

The plaintiff is a corporation for profit and has invested over $250,000 in decorating and furnishing a multiple story, retail establishment in Chicago, which serves food and drink and furnishes entertainment. It has retail liquor licenses and a restaurant license. A person desiring to gain admission to the premises may do so in three ways: (1) he can apply for membership, pay a $50 fee and, if accepted, is given a numbered key which unlocks no door but which identifies him and establishes his credit; (2) accompany someone who has a key or (3) present himself at the door, pay $50 and receive a receipt. The receipt does not entitle him to credit but it does give him and his guests admission privileges thereafter and the option of exchanging the receipt for a key. At the time of the trial (less than a year after the opening) there were some 20,000 members, about 1,600 receipts had been issued, between 25,000 and 26,000 patrons were being served each month with the gross volume amounting to around $80,000.

The litigation arose in this fashion: after the plaintiff had obtained the required licenses and had been in operation for two weeks, the Superintendent of Police requested an opinion from the Corporation Coun-

sel of the City as to the legality of the plaintiff's method of doing business. (In passing, it may be observed that the facts established by the evidence differed from those assumed in the seven questions propounded to the Corporation Counsel by the Police Superintendent.) A week later a formal opinion was rendered stating that the operation as described by the Superintendent was illegal. A copy of the opinion was sent to the plaintiff which a few days afterwards, in anticipation that the next step by the City would be an attempt at license revocation, filed this suit for declaratory judgment and for injunctive relief.

■ The City filed a motion to strike on the ground that declaratory judgment was an inappropriate remedy. The denial of this motion is a preliminary issue argued by the City in this appeal. Following the denial of its motion the City answered the complaint and it then filed a counterclaim which also prayed for a declaratory judgment. By pleading over, after the denial of its motion to strike, the City did not waive its objection to the plaintiff's action for declaratory judgment (Ill Rev Stats (1959) c 110, § 48(5)), but it did so by invoking the same remedy in a new action of its own.

■ Apart from this, the situation confronting the plaintiff at the time this suit was started made it singularly fitting to seek relief by way of declaratory judgment. The plaintiff had made a large investment in a business which, in its general outline, was in conformity with several others, long-conducted without interference by the City. It had received from the Department of Police an official opinion of the City's Department of Law stating that its method of doing business was illegal. It had every reason to believe that the City would proceed against it in accordance with the opinion. The success of its business depended upon the sale of memberships and the

threat of having its licenses revoked would discourage their sale. Its business and its investment were in jeopardy. A justiciable controversy existed. The facts and the interpretation of the applicable statutes were in dispute. The plaintiff did not have to sit back and wait for the blow to fall just because the altercation might be decided in an alternative action (Liquor Control Act, Ill Rev Stats (1959) c 43) which the City could invoke when it got ready. This was especially so in view of the plaintiff's offer in its complaint to promptly comply with the court's construction of the law. American Civil Liberties Union v. City of Chicago, 3 Ill2d 334, 121 NE2d 585; Kitt v. City of Chicago, 415 Ill 246, 112 NE2d 607; Retail Liquor Dealers' Protective Ass'n v. Fleck, 408 Ill 219, 96 NE2d 556.

The case proceeded to trial on five principal issues formed by the complaint, answer, counterclaim and reply. These issues were: (1) whether the plaintiff's manner of operating was in violation of the Liquor Control Act and the Civil Rights Act of Illinois in that it denied access to its premises to the general public; (2) whether its manner of operating prevented the police inspection required for statutory compliance; (3) whether its use of the words "club," "member," "membership," "rules," "bylaws" and "regulations" tended to deceive the public; (4) whether the plaintiff was attempting to benefit from the statutory privileges and exemptions extended private clubs organized not for profit and (5) whether permitting its members to purchase alcoholic beverages through credit rather than for cash was in contravention of the law. During the course of the trial the City withdrew the fifth issue. We will, therefore, consider the first four only, and in that order.

■ The Civil Rights Act has the following provision:

*"All persons entitled to equal enjoyment of accommodations—Discrimination in price on account of race or color prohibited.* All persons within the jurisdiction of said State of Illinois shall be entitled to the full and equal enjoyment of the accommodation, advantages, facilities and privileges of inns, restaurants, eating houses, hotels, soda fountains, soft drink parlors, taverns, roadhouses, barber shops, department stores, clothing stores, hat stores, shoe stores, bathrooms, restrooms, theaters, skating rinks, public golf courses, public golf driving ranges, concerts, cafes, bicycle rinks, elevators, ice cream parlors or rooms, railroads, omnibuses, buses, stages, aeroplanes, street cars, boats, funeral hearses, crematories and public conveyances on land, water or air, and all other places of public accommodations and amusement, subject only to the conditions and limitations established by laws and applicable alike to all citizens; nor shall there be any discrimination on account of race or color in the price to be charged and paid for lots or graves in any cemetery or place for burying the dead." Ill Rev Stats (1959) ch 38, sec 125.

The Liquor Control Act has a like provision:

*"Civil rights in licensed premises.* No licensee licensed under the provisions of this Act shall deny or permit his agents and employees to deny any person the full and equal enjoyment of the accommodations, advantages, facilities and privileges of any premises in which alcoholic liquors are authorized to be sold subject only to the conditions and limitations established by law and applicable alike to all citizens." Ill Rev Stats (1959) ch 43, sec 133.

In 1875 the Congress of the United States enacted a Civil Rights Act from which the wording of the Illinois statutes is taken. Other states have similar laws with almost identical language. The reviewing courts of the various jurisdictions have been uniform in interpreting these statutes as prohibiting discrimination because of color, creed or race. The construction given the Congressional act of 1875 by the Supreme Court of the United States has been followed:

"The first section, which is the principal one, cannot be fairly understood without attending to the last clause, which qualifies the preceding part.

"The essence of the law is, not to declare broadly that all persons shall be entitled to the full and equal enjoyment of the accommodations, advantages, facilities and privileges of inns, public conveyances and theatres; but that such enjoyment shall not be subject to any conditions applicable only to citizens of a particular race or color, or who had been in a previous condition of servitude. In other words, it is the purpose of the law to declare that, in the enjoyment of the accommodations and privileges of inns, public conveyances, theatres and other places of public amusement, no distinction shall be made between citizens of different race or color. . . ." Robinson and Wife v. Memphis & Charleston Railroad Co., 109 US 3.

See, Woollcott v. Shubert, 217 NY 212, 111 NE 829; Larson v. Wrigley Co., 183 Minn 28, 235 NW 393.

The distinction must be made between the legally prohibited discrimination based on color, creed and race, and the non-prohibited discrimination based on a financial exaction which applies equally to all men. We agree with the chancellor in the present case who said in his decision:

431

"The . . . Statutes of Illinois were not intended to regulate prices to be charged for such accommodations. The charge made by the plaintiff in the form of an initial fee, just as a cover charge, admission charge, or charges of high prices for alcoholic liquor served, may constitute an obstacle . . . for the enjoyment of such accommodations, but such obstacle obviously applies equally to persons similarly situated, of every race or creed."

"So long as the privileges of the plaintiff's establishment are available alike to all who pay the initial fee without regard to race, color or creed, the Civil Rights provisions and the provisions of the Liquor Control Act requiring full and equal enjoyment of the plaintiff's facilities and privileges have not been violated."

The record affirmatively shows that no discrimination was practiced by the plaintiff. Its membership application asks no questions about color, creed, birth or ancestry. Keys and receipts are issued with no qualification needed other than financial responsibility. There are colored members and they are accorded full equality. Some of these members were witnesses in the case. They testified that their applications were accepted without question, that accommodations in the club were impartially made available to them and that they received prompt and courteous service. The plaintiff's facilities are open to the public; the $50 requirement is the only restriction on admission and anyone who is willing to pay this one-time fee can enter, with guests, as often as he wishes. In this respect it does not differ, except in the size of the fee, from many other places where alcoholic beverages and food are served and where entertainment is presented. If it is visited with some frequency or with guests, the fee is far less than charged by other Chicago establish-

432

ments where a cover charge is exacted for each individual each time the establishments are patronized.

■ The Liquor Control Act provides that the local liquor control commissioner shall have the power to:

> "2. To enter or to authorize any law enforcing officer to enter at any time upon any premises licensed hereunder to determine whether any of the provisions of this Act or any rules or regulations adopted by him or by the State Commission have been or are being violated, and at such time to examine said premises of said licensee in connection therewith;" Ill Rev Stats (1959) ch 43, sec 112.

The opinion of the Corporation Counsel assumed and the City's counterclaim alleged that the plaintiff kept its doors locked. This was said to bar not only the public but law enforcement officials as well. The evidence supports neither the assumption nor the allegation. The keys are but symbolic of membership. The doors are not locked during business hours. They are open to everyone; after entrance is had identification is requested. The evidence also showed that police officers are not prevented from inspecting the premises. Upon showing their credentials they have ready access. No policeman testified that his entrance was denied, delayed or hindered if his occupation was made known. If policemen prefer not to identify themselves they may enter upon paying the regular charge which could be refunded under the plaintiff's established policies. Ununiformed policemen could enter as guests of any one of the 20,000 members or the police could easily plant an undercover agent among the thousands of members. In addition to this, the evidence is the plaintiff presented one of its keys to the captain of the local police district; use of this key would facilitate inspection. We find nothing in the evidence to suggest

433

that any impediment was placed in the way of police officials or that law enforcement was unreasonably hampered.

■ The argument is made that by designating itself as a club and by using words generally associated with a club the public may be deceived and prospective applicants misled. In our opinion the only word subject to this criticism is "bylaws." The plaintiff has no bylaws other than its corporate ones. This term suggests the internal procedures of an organization and when used in connection with "club" might be misleading. The word "club" itself has come to have a connotation compatible with the plaintiff's title. It is universally used by many businesses that are organized for profit and no one seems to be deceived. "Night Clubs," "Supper Clubs," "Christmas Savings Clubs," "Vacation Savings Clubs," "Motor Clubs," "Baseball Clubs," "Book Clubs" are some that have been called to mind. Many corner taverns call themselves clubs. "Member" and "membership" are words which flow naturally in association with "club" and this is especially so when deposit books, policies, receipts, cards, or other indicia of participation are distributed. "Regulations" and "rules" are normally understood as applying to the conduct and decorum of patrons and are not misleading. Undoubtedly, the plaintiff's manipulation of words, which is part of what it calls its "merchandising technique," has helped create an aura of privacy and an atmosphere of privilege. But the facts that its doors are wide open to anyone who has $50 and that it has in excess of 20,-000 members belie the pretense that it is exclusive and that its "clientele" is "limited to men of substance and influence in each urban area."

■ The issue of whether the plaintiff is benefiting from, without deserving, the statutory privileges

434

and exemptions extended private clubs organized not for profit is really many-pronged. As we understand the City's argument it runs like this: the plaintiff must be either a private club or a restaurant to operate as it does. It is not a private club although it pretends to be and acts like one in that it limits its sales to its own members. (Ill Rev Stats (1959) c 43, § 95.24.) It is not a restaurant because it is not a public place (c 43, § 95.23) and its principal business is the sale of alcoholic beverages (c 43, § 127 and § 142). Since it is neither a club nor a restaurant it is a mere retailer of alcoholic beverages (Municipal Code of Chicago, c 147, sec 147–9). As a retailer of alcoholic beverages it must comply with the law regulating such places. It does not comply with these laws because there is not a clear view of its interior from the outside (c 43, § 141), it is not well lighted (c 43, § 141) and it serves food free of charge (Municipal Code of Chicago, c 147, § 147–16).

The parts of this argument pertaining to the plaintiff selling only to its own members and not being a public place renews the discrimination issue. This has been discussed heretofore and no further elaboration is necessary here.

As to the assertion that its principal business is the sale of alcoholic beverages—if this is not just pure surmise, it must be an inference from the testimony that $1.50 is charged for each drink while dinners are available at the same price. Such meager evidence does not justify the inference and there is nothing else in the record that even remotely supports the assertion.

The remaining parts of the argument are predicated upon the premise that the plaintiff is not a restaurant and is, therefore, violating provisions of the Liquor Control Act and the Municipal Code of Chicago. Under the evidence the premise is not tenable and the conclusions drawn from it are unwarranted.

435

■ There was no error in the court's denying the plaintiff's prayer for injunction.

The decree for declaratory relief is affirmed with the exception of the third paragraph thereof which shall be amended to eliminate the words "members," "membership," "regulations" and "rules." The chancellor's denial of injunctive relief is affirmed.

Affirmed in part, reversed in part and remanded with directions.

SCHWARTZ and McCORMICK, JJ., concur.