THE CITY OF CHICAGO, Plaintiff-Appellee, *v.* CECIL E. SEVERINI *et al.*, Defendants-Appellants.

First District (5th Division)    No. 79-945

Opinion filed November 21, 1980.

Patrick A. Tuite and Stefan I. Mozer, both of Chicago, for appellants.

William R. Quinlan, Corporation Counsel, of Chicago (Robert R. Retke and Wayne T. Oesterlin, Assistant Corporation Counsel, of counsel), for appellee.

Mr. JUSTICE MEJDA delivered the opinion of the court:

The City of Chicago brought actions against defendants, Cecil E. Severini and Candy Club, Inc., for violations on 13 different dates of two city licensing ordinances. On March 6, 1979, after a bench trial, defendants were found guilty of failing, on January 11, 1979, to have a public place of amusement license (Municipal Code of Chicago, ch. 104.1, §104.1—2) and a retail food purveyor's license (Municipal Code of Chicago, ch. 130, §130—11) and were fined $200 plus $5 costs for each violation. The court ordered "Supervision June 5 [1979]" for each of the remaining charges of like violations on the 12 subsequent dates. On appeal, defendants contend that: (1) the City failed to prove by a clear

preponderance of the evidence a violation of either ordinance; and (2) defendants were erroneously placed on supervision for allegedly similar violations on different dates since no evidence was introduced on such charges. The following pertinent facts are not in dispute.

On January 11, 1979, Chicago police officers Daniel Schraeger and Frank Riggio were assigned to investigate the premises known as the Candy Club. Officer Schraeger entered alone, walked up to a woman in a glass booth inside the inner doors, and was told the fee to enter was $4. Upon payment, he was given a membership card without being requested to show identification or to make an application for membership. The same membership fee is payable every time a customer returns. There is a table charge of $6 per person which entitles the customer to all the near beer and soda desired. Officer Schraeger, upon entering, was approached by Severini, the club's manager, who asked if he would like to be seated near the stage. After being seated, he paid the waitress $6 and received a bottle of near beer and a second one later. A record player provided music while several females danced on the stage in various stages of dress and undress.

After watching the show Schraeger went out to confer with Officer Riggio. Both officers entered together. Riggio identified himself as a police officer. Upon inquiry, Severini stated that the only license he had was for the cigarette machine. He produced articles of incorporation issued by the Secretary of State of Illinois to defendant Candy Club, Inc., as a not-for-profit corporation. Severini testified that he was the manager, members had to be over 21 years old, intoxicated persons and those not neatly dressed are refused entry, and no hard liquor is served. He turns over the funds collected to the registered agent but did not know what was done with the funds or whether there was a surplus remaining after disbursements.

In addition to the violations charged on January 11, 1979, defendants were also charged with like violations on January 16, 17, 18, 19, 20, 23, 24, 25, 26, 27, 30 and 31, 1979.

The trial court found defendants guilty of violating on January 11, 1979, both ordinances and imposed fines. "Supervision June 5" was ordered for each of the remaining 24 charges. The trial court consolidated all of the cases for appeal.

OPINION

I.

Defendants first contend that the City failed to sustain by a clear preponderance of the evidence that defendants violated the public place of amusement licensing ordinance, section 104.1—2 of the Municipal Code of Chicago, which provides:

"It is unlawful for the owner or person in control of any property to produce, permit or conduct thereon, for gain or profit, any amusement, other than those excepted in Section 104.1—1 without first having obtained a license for a public place of amusement."

Section 104—1 defines "amusement" as "any theatrical, dramatic, musical or spectacular performance * * * or similar exhibition for public entertainment * * *." (Municipal Code of Chicago, ch. 104, §104—1.) No exceptions are stated in this section notwithstanding the language in section 104.1—2.

A city must prove the violation of an ordinance by a clear preponderance of the evidence. (*City of Chicago v. Joyce* (1967), 38 Ill. 2d 368, 373, 232 N.E.2d 289, 291; *City of Chicago v. Abdullah* (1979), 76 Ill. App. 3d 325, 330, 395 N.E.2d 50, 53.) Defendants maintain that the City failed to meet its burden of proof that defendants engaged in business for gain or profit and that the business is open to the public at large for use or entertainment.

(a)

Defendants argue that they do not fall within the ordinance definition of amusement since the performance is not for public entertainment. Defendants maintain they are a private club which can only be used by its members. They premise this argument on a membership policy which provides:

"Membership shall be open to individuals without discrimination upon the payment of an initial membership fee of $4.00. A membership card shall be issued following the payment of said fee. Said initial membership fee of $4.00 shall constitute membership in the club as well as dues to enter upon the premises on the date said membership fee is paid. Subsequently, each member shall be required to pay a $4.00 membership charge for each visit to the club. Following the payment of the initial membership fee membership shall be perpetual."

■■ Membership in a club arises out of the application of the member, its acceptance by the club, and the provisions of the bylaws by which both are to be governed in their relationship to each other. (*Ralph Martin & Co. v. McCue* (1940), 304 Ill. App. 358, 362, 26 N.E.2d 526, 528.) Defendants' membership policy and the evidence adduced at trial establishes that "membership" was open to any individual over 21 who was neatly dressed, not intoxicated and willing to pay the $4 membership fee. Defendants do not require an individual to show identification or to make an application for membership nor have any by-laws been adopted gov-

erning the relationship between the club and its members. Additionally, defendants do not maintain membership lists nor other records of the identity or number of the purported members.

In *Walton Playboy Clubs, Inc. v. City of Chicago* (1962), 37 Ill. App. 2d 425, 185 N.E.2d 719, although the club maintained membership lists and required identification, the only restriction on admission was a one-time membership fee of $50. The court observed that except for the size of the fee the club did not differ from any other Chicago establishment which exacts a cover charge from each individual each time it is patronized and concluded that the facilities were open to the public.

■ While defendants argue that the criteria for membership is left to the discretion of the club, the evidence amply established that Candy Club was not a private social club for bona fide members, but rather it conducted and presented an amusement which was open to the general public. The initial membership fee of $4 purportedly constitutes membership as well as dues to enter upon the premises for the date of payment. Furthermore, a like amount must be paid for each subsequent visit. Although variously designated membership "fee," "dues," and "charge," a $4 payment is required for each and every visit. The payment, howsoever designated, is indistinguishable from the customary entrance or admission charge required by similar establishments open to the public. Clearly, admission to the club and its entertainment is indiscriminately granted to any member of the public upon payment of the prescribed amount.

### (b)

Defendants further argue that the not-for-profit articles of incorporation issued by the State are *prima facie* evidence that the corporation operated neither for a gain nor profit and that the City introduced no evidence that defendants enjoyed any gain or profit to dispute the not-for-profit status. The contentions are without merit.

■■ A mere declaration in its certificate of incorporation that it was organized not for profit is not sufficient to stamp upon it a non-profit character; in each case, the true facts must be ascertained and the corporation judged accordingly, no matter what its scheme of operation or its pretentions may be; to do otherwise would sacrifice substance to form. *People ex rel. Hughes v. Universal Service Association* (1937), 365 Ill. 542, 546, 7 N.E.2d 310, 312.

The restriction imposed on the defendant corporation under Illinois law is that "no part of the income * * * is distributable to its members, directors, or officers" except as reasonable compensation for services. (Ill. Rev. Stat. 1977, ch. 32, pars. 163a1(c), 163a25.) The articles of incorporation for Candy Club stated its purpose "to operate membership social

club at 874 North Wabash, Chicago, Illinois, with all the powers provided the Illinois General Not for Profit Corporation Act, section 5." Section 5 provides for almost unlimited powers in the transaction of business including the power to buy, sell and mortgage real and personal property, and to invest, lend and borrow money. (Ill. Rev. Stat. 1977, ch. 32, par. 163a4.) No limitation is placed upon the corporation as to its operation for gain, profit, or income, although no part of its income may be distributed to its members, directors, or officers except for services rendered by them to the corporation.

■ *Gain* may be defined as profits, an increment in value, or the difference between receipts and expenditures; *profits* may be further defined as the gain realized from business or investments over and above expenditures. (See Webster's Third New International Dictionary 928, 1811 (1976); Black's Law Dictionary 807, 1376 (4th ed. 1968).) However, the language of the instant ordinance does not limit its application to amusements which are successful in making a gain or profit. Rather, it clearly applies to any amusement produced, presented or conducted on the premises "for gain or profit"; that is, *"for,"* with a purpose, design or objective of such gain or profit—whether successful or not. See *Miami Beach College Corp. v. Tomlinson* (1940), 143 Fla. 57, 59, 196 So. 608, 609.

■ We adopt the language appearing in *State ex rel. Johnson v. Lally* (1962), 59 Wash. 2d 849, 854, 370 P.2d 971, 974 (quoting from *American Jersey Cattle Club v. Glander* (1950), 152 Ohio St. 506, 90 N.E.2d 433), which states:

> " 'The fact, that a corporation is one not for profit, does not mean that its enterprises may not be conducted for gain, profit or net income. It is necessary to distinguish between gain, profit or net income to the incorporators or members and gain, profit or net income to the corporation as a legal entity. For example, there may be a nonprofit corporation, if there is no purpose of pecuniary gain or profit to the incorporators or members, and yet such a corporation may still be conducted for gain, profit or net income to the corporation as a legal entity.' "

Also see generally *Santa Clara Female Academy v. Sullivan* (1886), 116 Ill. 375, 6 N.E. 183; *Farm Progress Show Concessions v. Department of Revenue* (1980), 83 Ill. App. 3d 228, 403 N.E.2d 1242; 1 W. Fletcher, Cyclopedia Corporations §112, at 484 (perm. ed. rev. 1974).

■ The evidence established that defendants had a positive income resulting from the money paid each time an individual patronized the club. The income resulted principally from the items of $4 exacted as membership fees, dues and charges, as well as the items of $6 per person for table charges. Such revenue without more supports a purpose and plan to

have a profitable operation. No competent evidence was presented to rebut the reasonable inference that this amusement was presented other than as a business enterprise for profit or gain. Neither the club's articles of incorporation nor its membership policy indicate in any manner that profit or gain to defendants was not intended or permissible, or that none would be accepted. Defendants suggest that the corporation's expenditures would negate a profit objective. However, the ordinance applies if the amusement is presented with a purpose, design or objective of gain or profit—whether successful or not. Therefore, the ultimate use or disposition of the corporation's income would not be controlling nor require a different result in the instant case. The record supports the finding by the trial court that the amusement was conducted by defendants for gain and profit notwithstanding the corporation's not-for-profit status.

(c)

■ Accordingly, we conclude that the public place of amusement ordinance was applicable to defendants. Therefore, the judgment that defendants on January 11, 1979, violated the ordinance by failing to have a public place of amusement license, and imposing fine and costs, is proper and should be affirmed.

II.

Defendants next contend that the City failed to prove that defendants on January 11, 1979, violated the retail food purveyor's license ordinance in failing to have a food license for the premises. They argue that defendants are not purveyors; the business is a private club providing entertainment for members unrelated to delivery of food or drink which is offered to members only as a service; and there is no evidence the business offers for sale any food or drink. We do not reach the argument.

The complaint for January 11, 1979, alleged that defendants "did then and there violate Chapter 130, Section 130—11 of the Municipal Code of Chicago by no food license [sic] * * *." Except for dates, the complaints for January 23 and 24, 1979, were identical; and those for January 16, 17, 18, 19, 20, 25, 26, 27, 30 and 31, 1979, substituted the words "no food purveyor's license" in place of "no food license."

The trial record as well as the briefs and arguments in this court base the charges expressly on chapter 130, section 130—11 of the Municipal Code of Chicago. As set forth verbatim in the briefs, section 130—11 requires a license to engage in the business of food purveyor and section 130—10 defines "food purveyor * * * as any person operating a retail food establishment that keeps for sale, sells, or offers for sale at retail, or is in the business of delivering to consumers, any * * * drinks, * * * or

articles used as food * * *." The foregoing ordinance provisions were in force and effect prior to December 2, 1977.

■■ This court as well as the circuit court is required to take judicial notice *inter alia* of all general ordinances of municipal corporations within the State. Ill. Rev. Stat. 1977, ch. 51, pars. 48a and 48b; amended by Pub. Act 79-1362, effective October 1, 1976, and by Pub. Act 81-285, effective August 28, 1979.

■■ It was noted during oral argument although not briefed by the parties that on December 2, 1977, the City had passed an ordinance to amend the Municipal Code of Chicago, deleting in entirety chapters 130, 130.2, 140 and 142, and substituting a new chapter 130 entitled "Food Sanitation," effective January 1, 1978. (Journal of the Proceedings of the City Council of the City of Chicago, December 2, 1977, pp. 6435-6455.) The new ordinance became effective on January 1, 1978, and contains substantial revisions. It provided no savings clause applicable here. As a result, section 130—11 had been repealed and was of no force or effect on the dates of the alleged violations in January of 1979.

■■ It is well settled that a finding of guilty will be reversed where it appears that the ordinance under which defendant was convicted was not in force at the time of the alleged violation. (*City of Chicago v. Miller* (1909), 146 Ill. App. 530.) The repeal of an ordinance puts an end to all proceedings growing out of it, and pending at the time of repeal, unless saved by a clause in the repealing ordinance. (*County of Du Page v. Molitor* (1960), 26 Ill. App. 2d 232, 237, 167 N.E.2d 592, 595; *State National Bank v. Zoning Board of Appeals* (1979), 81 Ill. App. 3d 105, 107, 400 N.E.2d 433, 435.) It must be regarded as if it had never existed. (*Peisner v. City of Chicago* (1925), 318 Ill. 131, 137, 149 N.E. 18, 20.) Since the ordinance was not in force or effect on January 11, 1979, the judgment finding defendants guilty and imposing fines for not having a food license on that date must be reversed. For the same reason, the orders of supervision as to violations of section 130—11 on the 12 subsequent dates will be vacated and the actions dismissed pursuant to our powers under Supreme Court Rule 366. Ill. Rev. Stat. 1977, ch. 110A, par. 366.

### III.

Finally, defendants contend that the court erred in ordering supervision for allegedly similar offenses on the specified subsequent dates since no evidence was introduced regarding such charges. Defendants deny having stipulated that the evidence regarding the violations on January 11, 1979, would be applicable to these dates. Since it has been above determined that the orders of supervision as to the alleged food license violations must be vacated, defendants' contentions will be considered only as to the charges brought under the amusement licensing ordinance.

At the start of trial, the following discussion took place:

"THE COURT: Do you have these licenses

Defendants' Counsel: No Judge, It's our opinion—I think it's a legal question that we don't need a premises * * *

THE COURT: Do I understand from your statement, Counsel, that you would stipulate if the officer were to testify—that they would testify to what appears on the ticket as to the existence of the items, the provisions that are there in the club.

Defendants' Counsel: I would imagine they would testify to what they observed, yes."

Thereafter, trial was had concerning the charges for January 11, 1979, and fines were imposed for violations on that date. The court then considered the remaining charges and expressly stated, "I am entering an order of supervision instead of a finding of guilty and fine. If they make application for the license, I will discharge supervision. I will make it June 5." The court then added, "On the rest of this call [defendants' remaining cases], supervision June 5, [1979]."

Defendants' reliance on *City of Chicago v. Ross* (1977), 54 Ill. App. 3d 127, 369 N.E.2d 298, that the attempted stipulation in the present case was insufficient is misplaced. There the City's attorney initially refused to stipulate that the evidence in one case would apply to all cases. At sentencing, different counsel appeared for defendants and was advised that a fine was being entered "pursuant to the stipulation with counsel * * *." Apparently unaware of what transpired earlier, he answered "Yes, Judge." Under these circumstances the reviewing court held that "Yes, Judge" was insufficient to bind defendants to a stipulation into which the corporate counsel had earlier refused to enter.

■■ In the present case defense counsel not only did not object to the stipulation but responded in the affirmative and conducted the proceedings consistent with the entry of a stipulation. The present situation may be compared with *People v. Evans* (1978), 57 Ill. App. 3d 1044, 373 N.E.2d 524, where the court held that defendant's silence amounted to an assent to a stipulation. Consequently, the stipulation was valid and binding upon the defendants.

An examination of the record on appeal discloses that the half-sheets relative to the amusement ordinance cases (other than the violation of January 11, 1979), each contain the entry "Sup. 6—5—79." Nonetheless, the extended orders prepared therefrom for inclusion in the record on appeal by the clerk of the trial court each recite:

"Trial by Court. Finding defendants guilty in manner and form in the complainant herein. Judgment on finding. Defendants sentenced to THREE (3) MONTHS Court supervision.

Return date June 5, 1979."

■■ The extended orders are clearly inconsistent with the trial court's

rulings and the abbreviated entries made by the clerk on the half-sheet. The court expressly ruled that the order was "instead of a finding of guilty and fine." Consequently, on remand, the extended orders in the record should be corrected by the trial court to indicate that on March 6, 1979, only an order of supervision to June 5, 1979, was entered in each case.

We note that although supervision may be imposed as a final disposition under the Illinois Criminal Code (Ill. Rev. Stat. 1977, ch. 38, par. 1005—1—21), our research reveals no authority nor has any been cited for a similar dispositional order in cases involving violations of city ordinances. (See *People v. Breen* (1976), 62 Ill. 2d 323, 327-28, 342 N.E.2d 31, 33-34.) Furthermore, section 104.1—21 of of the Municipal Code of Chicago specifically mandates the imposition of a fine for any violation of section 104.1—2.

■■ Our review indicates that no finding or judgment, other than the order of supervision, was announced or entered as to the alleged violations of the amusement licensing ordinance on the dates subsequent to January 11, 1979. Inasmuch as no final and appealable orders have been entered, the appeals as to those cases must be dismissed and the cases remanded to the trial court for further proceedings.

## IV.

Accordingly, the judgment finding defendants guilty and imposing fines for violation on January 11, 1979, of the amusement licensing ordinance is affirmed; the judgment finding defendants guilty and imposing fines for violation of the food license ordinance on January 11, 1979, is reversed; the orders of supervision on the 12 remaining food license ordinance cases are vacated and the cases dismissed; and the appeal as to the 12 remaining amusement license ordinance cases is dismissed and the cases remanded to the trial court for further proceedings.

Affirmed in part; reversed in part; vacated and dismissed in part; and appeal dismissed in part and remanded.

SULLIVAN, P. J., and WILSON, J., concur.