QUAD CITIES OPEN, INC., *et al.*, Plaintiffs-Appellants, v. THE CITY OF SILVIS, Defendant-Appellee.

Third District   No. 3—02—0186

Opinion filed February 21, 2003.

Eric F. Schwarz, Robert T. Park (argued), and Joseph N. Van Vooren (argued), all of Snyder, Schwarz, Park & Nelson, P.C., of Rock Island, for appellants.

Thomas W. Kelty (argued) and Christopher E. Sherer (argued), both of Kelty Law Offices, P.C., of Springfield, and Dean L. Sutton, of Lytton, Sutton & Zimmer, of East Moline, for appellee.

PRESIDING JUSTICE McDADE delivered the opinion of the court:

Plaintiffs, Quad Cities Open, Inc. (the Open), and John Deere Classic Charitable Corporation (the Classic) sought declaratory judgment that their charitable golf tournament was exempt from a municipal amusement tax levied by the City of Silvis. On cross-motions for summary judgment, the trial court ruled in favor of the city. On appeal, plaintiffs contend that (1) the trial court erred in finding that

their charitable golf tournament is an athletic contest carried on for gain, and (2) the Classic has standing to bring this suit. We reverse.

## BACKGROUND

Quad Cities Open, Inc., is an Illinois not-for-profit corporation, and it has also been granted a tax exemption from federal income taxes under section 501(c)(3) of the Internal Revenue Code (26 U.S.C. § 501(c)(3) (2000)). The Open's sole purpose is to benefit Quad Cities-area charitable organizations by raising funds for and distributing them to such organizations. To this end, the Open has chosen to operate a certain major golf tournament as a means for accomplishing its objective. The Open's articles of incorporation state the following:

> "To sponsor a professional golf tournament and to operate same, with the specific purpose that all profits in excess of a one-year operating contingency fund (which shall not include the tournament prize) be used in promoting the common good and general welfare of the people of the Quad Cities area or be given to organizations which qualify for a tax exemption under 501(c)(3) of the Internal Revenue Code."

During the period under consideration, the Open sponsored the John Deere Classic Golf Tournament (the Tournament).

John Deere Classic Charitable Corporation operates a charitable program in conjunction with the tournament. The "Birdies for Charity" program allows representatives from various local charities to obtain sponsors who pledge a fixed amount of money to be donated for each birdie scored by the golfers during the tournament. The Classic is also an Illinois not-for-profit corporation.

In 2000, the tournament moved to the City of Silvis, Illinois. On December 17, 2000, the city enacted an ordinance imposing a 3% tax upon gross receipts from the sale of admission tickets at for-gain professional tournaments or other for-gain professional athletic events. City of Silvis Ordinance No. 2000—26 (eff. January 1, 2001). This ordinance was enacted pursuant to an Illinois enabling statute that states:

> "The corporate authorities of each municipality may license, tax, and regulate all athletic contests and exhibitions carried on for gain. This tax shall be based on the gross receipts derived from the sale of admission tickets, but the tax shall not exceed 3% of the gross receipts." 65 ILCS 5/11—54—1 (West 1992).

On April 4, 2001, the Open and the Classic filed their first amended complaint for declaratory judgment against defendant. In count I of the complaint, plaintiffs alleged that defendant's tax should not be imposed upon the price of admission because the golf tournament operated by the Open is not carried on for gain. In count II, plaintiffs

alleged that defendant's ordinance violated the uniformity clause of the Illinois Constitution. Ill. Const. 1970, art. IX, § 2.

In its answer, defendant admitted that the cost of admission tickets to the Open would be taxable under the ordinance because plaintiffs' golf tournament was not operated exclusively for charitable purposes. Defendant denied that an actual controversy exists between plaintiffs and defendant and that the enforcement of the ordinance will have an adverse effect on the revenue of the Tournament and the Classic.

Subsequent discovery reveals that the members of the board of directors of the Open were not compensated. The Open relies on a network of hundreds of volunteers in putting on its annual golf tournament, so there is only a handful of compensated employees. No corporate stock was issued and no dividends were distributed. The Open's financial statements for years 1998, 1999 and 2000 reveal that in 1998, the Open received total unrestricted revenues of $3,933,980. It incurred expenses of $3,491,702, including a tournament purse of $1,550,000, and contributed $345,460 to charities. In 1999, the Open received total unrestricted revenues of $4,619,540, and incurred expenses of $4,323,310, including a tournament purse of $2 million. The Open's charitable contributions totaled $379,130. And in 2000, the Open received total unrestricted revenues in the amount of $6,202,091, incurring expenses of $6,618,333, including a tournament purse of $2,600,000, and making charitable contributions of $353,807. The Tournament's net revenues from each year were kept in a reserve fund. The 3% tax on the admission fees paid to the Open for the 2001 tournament is estimated to be approximately $180,000.

The record also shows that 100% of the pledges from each sponsor of the Classic's "Birdies for Charity" program is returned to the individual charity that obtained the sponsor. None of the revenue collected from the Tournament's ticket sales is allocated or distributed to the Classic or the "Birdies for Charity" program. When asked about the Classic's interest in this action, the Tournament's director, Kym Hougham, testified at his deposition as follows:

"Q. How is it the three percent tax, which is on the ticket sales, would have an adverse effect on the Birdies for Charity program?

A. Unless—I think minimally honestly. I don't know that—except for the enthusiasm, if people don't participate because of it. I don't think there was ever a fear on our part that was going to happen. I don't know that the Birdies program will be adversely affected by it."

The parties filed cross-motions for summary judgment on count I of plaintiffs' complaint. In addition, defendant filed a second motion for summary judgment which alleges that: (1) the Classic lacks stand-

ing to pursue this lawsuit; and (2) the ordinance does not violate the uniformity clause. In support of plaintiffs' motion for summary judgment, plaintiffs' expert, Kay Hegarty, a certified public accountant, testified in her affidavit:

"(g) [E]ach expense of the Tournament, including the prize purse, appears necessary to effectuate the purpose of the OPEN as stated in its Articles. An expense only violates the private inurement doctrine if it is substantially more than similar expenses based on appropriate comparability data. That is, expenses must be similar in amount to corresponding expenses of comparable organizations or events. None of the documentation I have reviewed suggest expenditures by the OPEN that are unreasonable in their amount."

Defendant filed an amended counteraffidavit of its expert witness James A. Nepple. Nepple testified to the following statements:

"The Open operates its business as a for-profit enterprise as evidenced by the following facts set forth as indicated in the [Open's] PGA contract: (i) under Section 5 it sells media rights to television for profit; (ii) under Section 5 it sells media rights to radio for profit; (iii) under Section 5 it sells computer network/ internet broadcasting media rights for profit; (iv) Section 6 of the contract entitles the Open to receive non-tournament revenues from the PGA television rights fund; (v) Section 6.4.2 of the contract requires the Open to maintain financial responsibility and liquidity independent of its charitable operations; (vi) under Section 7 of the contract the Open purchases the right to use of PGA intellectual property and the right to resell same for a profit.
***
During its most recent fiscal year, the Open expended the following sums of money: (i) $200,000 for new and improved access roads and cart paths at TPC Deere Run golf course, a privately owned facility; (ii) $200,000 for electrical and wiring upgrades at TPC Deere Run Golf Course, a privately owned facility; and (iii) $100,000 for water wells and office rehabilitation for the Open."

These statements were not disputed by the Open.

On February 26, 2002, the trial court granted defendant's motions for summary judgment and the dismissal of plaintiffs' complaint with prejudice. Plaintiffs' motion for summary judgment was denied. The court determined that the Open's tournament is an athletic contest carried on for gain within the meaning of the enabling statute. The trial judge wrote in her opinion and order:

"The Open has characterized its primary purpose as charitable. However, purely charitable organizations such as the Red Cross or the United Way presumably don't spend three to six million dollars per year so that they can raise $350,000 per year for charity."

Plaintiffs filed their notice of appeal on March 13, 2002, seeking reversal of the trial court's order granting defendant's motions for summary judgment. No appeal is taken from the trial court's decision that the ordinance does not violate the uniformity clause of the Illinois Constitution.

## ANALYSIS

### I. Carried on for Gain

■ In Illinois, summary judgment is governed by the provisions of section 2—1005 of the Code of Civil Procedure. 735 ILCS 5/2—1005 (West 1994). Under section 2—1005(c), a party is entitled to summary judgment "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2—1005(c) (West 1994). When parties file cross-motions for summary judgment, they agree that only a question of law is involved and invite the court to decide the issues based on the record. *Allen v. Meyer*, 14 Ill. 2d 284, 152 N.E.2d 576 (1958). Where the record only presents a question of law, a trial court may properly enter a motion for summary judgment. *Meyer*, 14 Ill. 2d at 292.

The first contention made by the Open is that plaintiffs' tournament does not come within the meaning of the statutory language "carried on for gain" and is thus exempt from the challenged tax under the enabling statute quoted above. 65 ILCS 5/11—54—1 (West 1993).

■ This issue necessarily involves the interpretation of the statutory language "carried on for gain" as used in the enabling statute. The fundamental rule of statutory construction is to ascertain and give effect to the intention of the legislature. *Nottage v. Jeka*, 172 Ill. 2d 386, 392, 667 N.E.2d 91 (1996). Where statutory language is ambiguous, the court may look to the nature and subject matter of the act and to the necessity or reason for its enactment. *Lee Lumber & Building Material Corp. v. Department of Revenue*, 79 Ill. App. 3d 1015, 1018, 398 N.E.2d 933 (1979), citing *Nicholson v. Village of Schaumburg Center*, 33 Ill. App. 2d 197, 178 N.E.2d 680 (1961), and *In re Roberts Park Fire Protection District*, 61 Ill. 2d 429, 337 N.E.2d 8 (1975). Any doubt as to the application of taxing laws must be strongly construed against the government and in favor of the taxpayer. *Village of Niles v. K mart Corp.*, 158 Ill. App. 3d 521, 511 N.E.2d 703 (1987), citing *Caterpillar Tractor Co. v. Department of Revenue*, 29 Ill. 2d 564, 194 N.E.2d 257 (1963).

■ We do not believe our General Assembly adopted the enabling

statute to tax events organized and operated exclusively for charitable purposes. Illinois has traditionally recognized the exemption of charitable organizations from taxation. The state first recognized the tax exemption of charitable organizations with the enactment of article IX of the Illinois Constitution, which provides:

"The General Assembly by law may exempt from taxation only the property of the State, units of local government and school districts and property used exclusively for agricultural and horticultural societies, and for school, religious, cemetery and charitable purposes." Ill. Const. 1970, art. IX, § 6.

Pursuant to this authority, the General Assembly of Illinois enacted section 15—65 of the Property Tax Code (35 ILCS 200/15—65 (West 1996)). This section exempts all property belonging to:

"Beneficent and charitable organizations incorporated in any state of the United States, including organizations whose owner, and no other person, uses the property exclusively for the distribution, sale, or resale of donated goods and related activities and uses all the income from those activities to support the charitable, religious or beneficent activities of the owner, whether or not such activities occur on the property." 35 ILCS 200/15—65 (West 1996).

■ Additionally, section 3—5(4) of the Illinois Use Tax Act provides for an exemption from taxation if a corporation purchasing property is organized and operated exclusively for charitable purposes. 35 ILCS 105/3—5(4) (West 1996). The Illinois Retailers' Occupation Tax Act also allows "a corporation, society, association, foundation, or institution organized and operated exclusively for charitable, religious, or educational purposes" to purchase goods free of the state sales tax. 35 ILCS 120/2—5 (11) (West 1996).

■ In reaching our conclusion that the legislature did not intend to tax events organized and operated exclusively for charitable purposes, we also rely on the case of *People v. Young Men's Christian Ass'n of Chicago*, 365 Ill. 118, 6 N.E.2d 166 (1936) (*YMCA*). In *YMCA*, a question was raised as to whether the maintenance and operation of a hotel with incidental benefits and services furnished to its patrons by the Young Men's Christian Association of Chicago at certain fixed rates and charges was *ultra vires* its corporate powers and charter. The Illinois Supreme Court held that the primary objective of the YMCA was charitable and not for the purpose of making a profit. It reasoned that the object of operating the hotel was the furnishing of wholesome living conditions to young men at a price that they could afford to pay and that the incidental services furnished to and paid for by its patrons were in furtherance of its primary object as a charitable organization and not for profit. *YMCA*, 365 Ill. at 123. Most impor-

tantly, the court noted that the test to apply is "whether the primary purpose of the institution is charitable, or whether its primary purpose is the making of a profit and the devoting of these profits to charitable purposes." *YMCA*, 365 Ill. at 122-23.

Since there is an absence of controlling Illinois authority dealing directly with the question presented, we also find it useful to refer to the analysis found in *Akron Golf Charities, Inc. v. Limbach*, 34 Ohio St. 3d 11, 516 N.E.2d 222 (1987). In *Akron*, the Ohio Supreme Court held that the fact that a nonprofit corporation operated a nationally known professional golf tournament did not mean that the corporation was not operated exclusively for charitable purposes. The statutory exemption in *Akron*, section 5739.02(B)(12) of the Ohio code, applied to sales of tangible personal property or services to, among others, "nonprofit organizations operated exclusively for charitable purposes." Ohio Rev. Code Ann. § 5739.02(B)(12) (West 2002). The statute provided further that "sales to any organization for use in the operation or carrying on of a trade or business" were not exempt. Ohio Rev. Code Ann. § 5739.02(B)(12) (West 2002). The Ohio taxing authority concluded that Akron Golf Charities, Inc., was not exempt because it carried on the business of staging an annual professional golf tournament of national renown. This position was erroneous, the court held, because it ignored the fundamental purpose of the nonprofit corporation. *Akron*, 34 Ohio St. 3d at 13, 516 N.E.2d at 224. The court emphasized that the corporation or its officers had no profit motive and that they did not operate the corporation for material gain:

> "There is no question that the operation of a golf tournament or for that matter any sort of endeavor in which prize money is awarded to contestants has many of the characteristics of a profit-making business. However, the focus of the exemption granted by the legislature is always unequivocally placed on the purpose and actual operation of the corporation that desires the exemption. Charities' purpose is one that is restricted by its articles of incorporation, its code of regulations, and its federal tax exemption in part to serving the charitable needs of the Akron community. Charities is committed to raising money for Akron charities, which in turn render help and assistance to those in need or serve the educational needs of the greater Akron area.
>
> Appellee does not argue that Charities has violated its articles of incorporation. Indeed, the [taxing authority] lauded the activities of Charities. To suggest that Charities has the status of a 'business' solely because it staged a major golf tournament simply ignores the fact that the golf tournament is nothing more than a means to a charitable end." *Akron*, 34 Ohio St. 3d at 13, 516 N.E.2d at 224-25.

In finding the tournament was "carried on for gain," the trial court in the present case relied on *City of Chicago v. Severini*, 91 Ill. App. 3d 38, 414 N.E.2d 67 (1980). This case does not support the trial court's finding. The *Severini* case involved the City of Chicago Municipal Code, which provides:

> " 'It is unlawful for the owner or person in control of any property to produce, permit or conduct thereon, for gain or profit, any amusement, other than those excepted in Section 104.1—1 without first having obtained a license for a public place of amusement.' " *Severini*, 91 Ill. App. 3d at 42, quoting Chicago Municipal Code § 104 (1980).

■ A Chicago strip club attempted to escape the coverage of the licensing ordinance by arguing that its not-for-profit articles of incorporation issued by the state are *prima facie* evidence that the club operated for neither gain nor profit. The Illinois Appellate Court rejected this argument. The court noted:

> "A mere declaration in its certificate of incorporation that it was organized not for profit is not sufficient to stamp upon it a non-profit character; in each case, the true facts must be ascertained and the corporation judged accordingly, no matter what its scheme of operation or its pretentions may be; to do otherwise would sacrifice substance to form." *Severini*, 91 Ill. App. 3d at 43.

Like the holding in *YMCA* and *Akron*, the above-quoted language clearly shows that the court used the strip club's underlying purpose or motivation to determine its "for gain or profit" status. Defendant concedes this point in its appellate brief.

Likewise, we reject defendant's attempt to analogize plaintiffs' activities to the activities described in *Betsy King LPGA Classic, Inc. v. Township of Richmond*, 739 A.2d 612 (Pa. Commw. 1999). In that case, the Commonwealth Court of Pennsylvania held that a charity golf tournament and the related charitable corporation were not institutions of "purely public charity" and, therefore, were not exempt from a local amusement tax. The court specifically held that Betsy King LPGA Classic, Inc., and Betsy King Charities, Inc. (collectively, Betsy King), were not exempt from paying the local amusement tax because a majority of the revenue produced from the tournament financed the purse for the contestants of the tournament. *Betsy King*, 739 A.2d at 615. We must be mindful that the *Betsy King* court specifically premised its holding on title 61, section 32.1, of the Pennsylvania code, which states, in pertinent parts:

> "(iv) An organization's primary purpose cannot involve the promoting or sponsoring of a noncharitable fund raising event such as an athletic or other special event. However, a charitable organization will not lose its status merely because it hires a

promoter to run an event to raise funds to support the organization's charitable purpose. Examples of noncharitable fundraising events and charitable fundraising events are as follows:

(A) An organization which exists for the primary purpose of sponsoring athletic events hires a promoter to run a professional golf tournament. The money raised by the event is used to pay the promoter for his services or to pay the event participants with any remaining funds distributed to exempt organizations. This is a noncharitable fundraising event." 61 Pa. Stat. Ann. § 32.1 (2002).

In *Betsy King*, the charities involved employed International Golf, Inc., which specializes in managing golf tournaments, to promote their 1996 and 1997 golf events. We did not find a similar statute in Illinois.

■ In light of the foregoing discussion, we find that plaintiffs presented undisputed facts to show that each year, they conduct the John Deere Classic Golf Tournament after which they distribute most of the net proceeds to *bona fide* Quad Cities charities. The statements of the Open's agents and the wording of its governing legal documents evidence an intention to use its property exclusively for charitable purposes. Nothing in the record suggests that either the Open or any officer thereof is or has been operating it for a profit to themselves. These undisputed material facts require us to hold, as a matter of law, that plaintiffs' tournament does not come within the meaning of the statutory language "carried on for gain" and is thus exempt from the challenged tax under the enabling statute. Accordingly, we reverse the summary judgment entered in favor of defendant on count I of the complaint and grant plaintiffs' summary judgment motion on the same count.

## II. The Classic Lacked Standing

In their second contention, plaintiffs claim that the trial court erred in finding that the Classic lacked standing to bring this suit. We find no error and we affirm.

■ The doctrine of standing seeks to insure that courts decide actual controversies and not abstract questions. *People v. $1,124,905 U.S. Currency & One 1988 Chevrolet Astro Van*, 177 Ill. 2d 314, 328, 685 N.E.2d 1370 (1997). In Illinois standing requires only some injury in fact to a legally cognizable interest. *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 524 N.E.2d 561 (1988). The claimed injury may be actual or threatened, and it must be (1) distinct and palpable; (2) fairly traceable to the defendant's actions; and (3) substantially likely to be prevented or redressed by the grant of the requested relief. *Greer*, 122 Ill. 2d at 492-93. Moreover, in the context of an action for declaratory judgment, there must be an actual controversy between adverse parties, and the party requesting the

declaration must possess some personal claim, status or right that is capable of being affected by the grant of such relief. *Glisson v. City of Marion*, 188 Ill. 2d 211, 720 N.E.2d 1034 (1999). We review the standing issue *de novo*. *Kankakee County Board of Review v. Property Tax Appeal Board*, 316 Ill. App. 3d 148, 735 N.E.2d 1011 (2000).

■ Here, the Classic did not present any evidence to support a real interest in the outcome of the controversy. The "Birdies for Charity" program allows representatives from various local charities to obtain sponsors who pledge a fixed amount of money to be donated for each birdie scored by the golfers during the tournament. The tax in question is levied on the tournament and persons who purchase tickets to the tournament. The Classic does not pay or collect the tax imposed by the ordinance. None of the revenue collected from the tournament's ticket sales is allocated or distributed to the Classic or the "Birdies for Charity" program. The tournament's director, Kym Hougham, also admitted in his deposition testimony that he doesn't know if the "Birdies program will be adversely affected by [the ordinance]."

The record does not support the existence of an interest in the outcome of the litigation that would confer standing on the Classic nor does it demonstrate a material factual dispute which would create a triable issue.

## CONCLUSION

We reverse the trial court's grant of defendant's summary judgment motion on count I of the complaint and enter a summary judgment in favor of the Open on the same count. We affirm the grant of summary judgment on count II of the complaint.

Reversed in part, affirmed in part.

HOLDRIDGE and SLATER, JJ., concur.