(No. 95972.—

QUAD CITIES OPEN, INC., Appellee, v. THE CITY OF SILVIS, Appellant.

*Opinion filed January 23, 2004.*

KILBRIDE, J., took no part.

Michael T. Reagan, of Herbolsheimer, Lannon, Henson, Duncan & Reagan, P.C., of Ottawa, and Dean L. Sutton, of East Moline, for appellant.

Robert T. Park and Joseph N. Van Vooren, of Snyder, Schwarz, Park & Nelson, P.C., of Rock Island, for appellee.

JUSTICE FITZGERALD delivered the opinion of the court:

In this appeal we examine whether the City of Silvis may tax the gross receipts from the sale of admission tickets to a charitable golf tournament, a tournament sanctioned by the Professional Golfers' Association (PGA), and operated by Quad Cities Open, Inc. (Open). The Illinois Municipal Code permits municipal corporate authorities to "license, tax, and regulate all athletic contests and exhibitions carried on for gain." 65 ILCS 5/11—54—1 (West 2002). The appellate court held that the charitable golf tournament was not conducted "for gain" and, consequently, was exempt from tax. 337 Ill.

App. 3d 251. Accordingly, at issue in this appeal is the meaning of "for gain" under the Municipal Code and whether the tournament is carried on "for gain" and therefore subject to taxation.

## BACKGROUND

The Open, first incorporated in 1976 as an Illinois not-for-profit corporation, has been granted federal tax-exempt status under the Internal Revenue Code (26 U.S.C. § 501(c)(3) (2000)). The Open's articles of incorporation state the purpose of the corporation:

"To sponsor a professional golf tournament and to operate same, with the specific purpose that all profits in excess of a one-year operating contingency fund (which shall not include the tournament prize) be used in promoting the common good and general welfare of the people of the Quad Cities area or be given to organizations which qualify for a tax exemption under 501(c)(3) of the Internal Revenue Code.

No part of the net earning of the corporation shall inure to the benefit of any Director of the corporation, officer of the corporation, or any private individual (except that reasonable compensation may be paid for services rendered to or for the corporation affecting one or more of its purposes), and no Director or officer of the corporation, or any private individual shall be entitled to share in the distribution of any of the corporate assets on dissolution of the corporation."

To achieve this purpose, the Open has operated an annual PGA tour sponsored golf tournament in the Quad Cities area. For 31 years the tournament varied in location and name depending on the title sponsor. Each year, the Open contributes excess revenue from the tournament to Quad Cities area charities such as the American Red Cross, Junior Achievement, the Easter Seals Foundation, the Boy Scouts, Special Olympics, the YMCA of the Quad Cities, the March of Dimes, and the Make-A-Wish Foundation. In 1998 Deere & Company became the event's title sponsor and it was thereafter named the

John Deere Classic Golf Tournament (the tournament). In 2000, the Open moved the tournament to the Tournament Players' Club (TPC) at Deere Run golf course, a newly constructed golf course in Silvis, Illinois. The Open also moved its operations and offices to the City of Silvis.

Soon afterwards, Silvis enacted an ordinance imposing a 3% tax upon "gross receipts from the sale of admission tickets at for gain professional tournaments or other for gain professional athletic events." City of Silvis Ordinance No. 2000—26—60 (eff. January 1, 2001). Silvis enacted the ordinance pursuant to section 11—54—1 of the Illinois enabling statute, which authorizes municipalities to regulate and tax athletic contests "carried on for gain." 65 ILCS 5/11—54—1 (West 2002). On April 4, 2001, the Open sought a declaratory judgment against Silvis. In its complaint, the Open alleged that the tournament is not subject to taxation under the ordinance because the tournament is not "carried on for gain" within the meaning of the enabling statute.[1]

Discovery revealed the following undisputed facts. The Open is operated and directed by volunteers who offer their time and expertise in both the planning of and execution of the actual event. No net earnings are paid to either officers or directors, with the exception of the tournament director, who is paid an annual salary. For the fiscal years 1998 to 2000, the tournament's gross revenues totaled $14,755,611. The Open paid $6,150,000 in purses to golfers, distributed $1,078,397 to legitimate charities, set aside a portion to the operating reserve fund, and devoted the remainder to the tournament's operating expenses. Examples of operating expenditures

---

[1]In its complaint, the Open also alleged that the ordinance violates the uniformity clause of the Illinois Constitution (Ill. Const. 1970, art. IX, § 2). The trial court held that the ordinance does not violate the uniformity clause, and the parties did not appeal that decision.

include: $200,000 for road and cart path work required to repair damage caused by heavy equipment used to construct grandstands, television stands, and skyboxes; $200,000 for electrical and wiring upgrades required for scoreboards, media facilities, grandstands, concessions and other services; and approximately $100,000 for water well construction requested by the Silvis health department. The record further reveals that in 1998 and 1999 the Open's unrestricted revenue exceeded total expenses. In 2000, the unrestricted revenue was $416,242 less than expenses, and the Open suffered a loss. In both 1999 and 2000 the Open drew assets from its operating reserve fund for payment of tournament expenses, and following the conclusion of the tournament in 2000 the reserve fund totaled $471,273. During the year the tournament operated at a loss, the Open continued to donate to Quad Cities area charities.

In addition, the Open makes possible the Birdies for Charity program. Operated by the John Deere Classic Charitable Corporation, a nonparty to this appeal, Birdies for Charity solicits individual pledges and donations for each birdie scored during the tournament. The Open pays all overhead for the program, and in return the program donates to charity 100% of the revenue. During the years 1997 to 2000, the program raised and donated to charity $2,406,651.22.

Following discovery, the parties filed cross-motions for summary judgment. The Open attached the affidavit of Kay Hegarty, a certified public accountant, who stated in her affidavit:

"[E]ach expense [of the tournament], including the prize purse, appears necessary to effectuate the purpose of the OPEN as stated in its Articles. An expense is considered to violate the private inurement doctrine if it is substantially more than similar expenses based on appropriate comparability data. That is, expenses must be similar in amount to corresponding expenses of comparable organizations or

events. None of the documentation I have reviewed suggest expenditures by the OPEN that are unreasonable in their amount.

* * *

None of the terms and obligations found in the contract between the OPEN and the PGA support a suggestion that the OPEN operates for gain. The testimony is based upon the fact that the provisions in the contract are necessary in order to define the rights and obligation of the parties [the OPEN and the PGA]. Moreover, since the activities conducted pursuant to the contract, i.e. to sponsor a professional golf tournament, constitute the basis for the OPEN's tax exempt status, no portion of revenue from the Tournament is subject to federal income tax as an unrelated trade or business."

Silvis filed a counteraffidavit of its expert witness, James A. Nepple:

"The Open operates its business as a for-profit enterprise as evidenced by the following facts set forth as indicated in the [Open's] PGA contract: (i) under Section 5 it sells media rights to television for profit; (ii) under Section 5 it sells media rights to radio for profit; (iii) under Section 5 it sells computer network/internet broadcasting media rights for profit; (iv) Section 6 of the contract entitles the Open to receive non-tournament revenues from the PGA television rights fund; (v) Section 6.4.2 of the contract requires the Open to maintain financial responsibility and liquidity independent of its charitable operations; (vi) under Section 7 of the contract the Open purchases the right to use of PGA intellectual property and the right to resell same for a profit.

* * *

During its most recent fiscal year, the Open expended the following sums of money: (i) $200,000 for new and improved access roads and cart paths at TPC Deere Run golf course, a privately owned facility; (ii) $200,000 for electrical and wiring upgrades at TPC Deere Run Golf Course, a privately owned facility; and (iii) $100,000 for water wells and office rehabilitation for the Open."

The trial court deemed that the "Open, like much of professional sports, is a major business enterprise." The proceeds paid to the professional participants exceeds the amount of charitable contributions and is evidence that the Open's charitable purpose is incidental. The trial court concluded that the Open was more like a typical business, and that like many for-profit businesses it was charitable but clearly "carried on for gain." Specifically, the trial court held that, "[t]he Open has characterized its primary purpose as charitable. However, purely charitable organizations such as the Red Cross or the United Way presumably don't spend three to six million dollars per year so that they can raise $350,000 per year for charity." The trial court denied the Open's motion for summary judgment, and granted Silvis' cross-motion for summary judgment and dismissal of the Open's complaint with prejudice.

The appellate court reversed the trial court. 337 Ill. App. 3d 251. The appellate court construed the meaning of the term "for gain" and concluded: "We do not believe our General Assembly adopted the enabling statute to tax events organized and operated exclusively for charitable purposes. Illinois has traditionally recognized the exemption of charitable organizations from taxation." 337 Ill. App. 3d at 256-57. Accordingly, the appellate court held, because the record demonstrated that the Open distributes most of the net proceeds to *bona fide* charities, and neither the Open nor any of its officers operated for a profit to themselves, the tournament did not operate "for gain" within the meaning of the enabling statute and was exempt from taxation. 337 Ill. App. 3d at 260.

We granted Silvis' petition for leave to appeal. 177 Ill. 2d R. 315. We now affirm the appellate court.

## ANALYSIS

Silvis is a non-home-rule unit of local government and, therefore, may exercise only those powers granted

to it by law and the Illinois Constitution. Ill. Const. 1970, art. VII, § 7. The Silvis ordinance (City of Silvis Ordinance No. 2000—26—60 (eff. January 1, 2001)) was enacted pursuant to section 11—54—1 of the Illinois Municipal Code, which provides that:

"The corporate authorities of each municipality may license, tax, and regulate all athletic contests and exhibitions carried on for gain. This tax shall be based on the gross receipts derived from the sale of admission tickets, but the tax shall not exceed 3% of the gross receipts." 65 ILCS 5/11—54—1 (West 2002).

The term "for gain" is not defined in any part of the Illinois Municipal Code. The Open argues that "for gain" was meant to "include events that distribute excess revenue to private individuals and/or non-charitable organizations but not to events that distribute excess revenue only to legitimate, recognized charities." Therefore, the Open maintains that entities like itself that distribute excess revenue to charities are not operating "for gain" and cannot be subject to taxation under the enabling statute.

Silvis argues that the disposition of the net proceeds after the event is irrelevant and that our assessment of whether the tournament is carried on "for gain" should be based upon the general character of the event. Particularly, Silvis argues that the tournament is "for gain" because the athletic contestants are paid, and the event is carried on for a purpose other than losing money: the event is a "major professional golf tournament in which the participants are paid millions, and in which the revenue far exceeds expenses." According to Silvis, our analysis of this matter could end at the fact that this was a professional golf tournament conducted for prize money.

In order to determine whether the tournament is "carried on for gain," the trial court examined the operation of the tournament to ascertain its "primary pur-

pose." Section 6 of article IX of the Illinois Constitution provides, *inter alia*, that to be exempt from taxation property must be used "exclusively" for charitable purposes. Ill. Const. 1970, art. IX, § 6 ("The General Assembly may exempt from taxation *** property used exclusively for agricultural and horticultural societies, and for school, religious, cemetery and charitable purposes"). Our legislature has codified this exemption in various enactments, such as the Illinois Use Tax Act. See, *e.g.*, 35 ILCS 105/3—5 (4) (West 2002) (entitled "Exemptions" and, in part, exempting property purchased by an institution organized and operated exclusively for charitable purposes). In order to ascertain whether property is "exclusively used" for charitable purposes we have held that " 'exclusively used' means the primary purpose for which property is used and not any secondary or incidental purpose." *Methodist Old Peoples Home v. Korzen*, 39 Ill. 2d 149, 157 (1968); see also *Wyndemere Retirement Community v. Department of Revenue*, 274 Ill. App. 3d 455, 460 (1995). This analysis, however, applies to claims for tax *exemption*. A statute providing an exemption is strictly construed in favor of taxation and against exemption; the party seeking exemption must prove entitlement. *Wyndemere Retirement Community*, 274 Ill. App. 3d at 460; *Yale Club of Chicago v. Department of Revenue*, 214 Ill. App. 3d 468 (1991) (the burden of proving entitlement to an exemption is upon the entity seeking exemption, and all questions are resolved in favor of taxation). In the instant matter, exemption is not the issue.

Rather, the issue is whether the statute, by the phrase "for gain," applies to a particular group— charitable organizations that organize and operate an athletic event with the specific purpose of promoting the common good and general welfare. The Open does not seek an exemption; they maintain that the enabling

statute simply does not apply. Thus, under this circumstance, the following principle applies: " '[t]axing laws are to be strictly construed and they are not to be extended beyond the clear import of the language used. If there is any doubt in their application they will be construed most strongly against the government and in favor of the taxpayer.' " *Getto v. City of Chicago*, 77 Ill. 2d 346, 359 (1979), quoting *Oscar L. Paris Co. v. Lyons*, 8 Ill. 2d 590, 598 (1956), citing *Peoples Gas Light & Coke Co. v. Ames*, 359 Ill. 152 (1934); see also *Gem Electronics of Monmouth, Inc. v. Department of Revenue*, 183 Ill. 2d 470, 475 (1998) ("statutes imposing a tax are strictly construed against the government and in favor of the taxpayer").

Our initial task in this appeal is to consider the meaning of the statutory language "for gain." The construction of a statute is a question of law, and our standard of review is *de novo*. *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 503 (2000). Long-standing principles of statutory construction dictate that we give effect to the intention of the legislature. *People ex rel. Devine v. $30,700.00 United States Currency*, 199 Ill. 2d 142, 150 (2002). When the language of a statute is clear and unambiguous, a court must give effect to the plain and ordinary meaning of the language without resort to other tools of statutory construction. *People v. Glisson*, 202 Ill. 2d 499, 504-05 (2002). We must construe the statute so that each word, clause, or sentence is given reasonable meaning and not deemed superfluous or void. *Glisson*, 202 Ill. 2d at 505.

The plain meaning of the term "for gain" as it is used in the enabling statute is not clear or unambiguous. Rather, as demonstrated by the trial and appellate courts in this case, the term is susceptible to two reasonable and conflicting interpretations. Silvis is correct when it argues that gain is generally defined as the "difference

between receipts and expenditures," "profits," or "winnings." See Black's Law Dictionary 686 (7th ed. 1999). "For gain," however, has another commonly understood meaning. That is, "for gain" or "for profit" is also understood as the opposite of charitable or not-for-profit. *People v. Young Men's Christian Ass'n of Chicago*, 365 Ill. 118, 122 (1936) ("charitable nature of an organization depends upon whether its object is to carry out a purpose recognized in law as charitable, or whether it is maintained for gain, profit or private advantage"). Reading "for gain" in this manner tends to support the Open's position.

In resolving this statutory ambiguity, we must assume that the legislature did not intend absurdity to result from the legislation. *Glisson*, 202 Ill. 2d at 505. Silvis' interpretation of "for gain" excludes one type of event from taxation under the statute—events carried on to lose money. Common sense dictates that the legislature must have intended another meaning. Furthermore, we can conceive of no events which would fit this characterization and Silvis has identified none. Under Silvis' reading of the statute, *all* athletic contests and exhibitions could be taxed, thereby rendering the phrase superfluous. See *Glisson*, 202 Ill. 2d at 505 (we must construe statutes in a manner that does not render a word superfluous or void).

Rather, like the appellate court, we believe the legislature did not intend "for gain" to include events organized and operated for charitable purposes. The exclusion of such events from "for gain" is consistent with this state's long-standing preference to exclude charitable organizations from taxation. In *People v. Young Men's Christian Ass'n* (hereinafter *YMCA*), we observed that favorable treatment toward charitable organizations advances governmental interests because charities lessen the " 'burdens of government.' " *YMCA*,

365 Ill. at 121-22, quoting *Crerar v. Williams*, 145 Ill. 625, 643 (1893). Legislative enactments extend preferential treatment in order to promote the creation of charitable organizations for the betterment of our citizens in need. *YMCA*, 365 Ill. at 122; see, *e.g.*, 35 ILCS 120/2—5(11) (West 2002) (Retailers' Occupation Tax Act); 35 ILCS 105/3—5(4) (West 2002) (Use Tax Act); 35 ILCS 200/15—65(b) (West 2002) (Property Tax Code). If this court were to conclude that the legislature meant to include events organized for charity within the term "for gain," it would require that we ignore a clear pattern of preferential treatment for such organizations.

The fact that an athletic event operated by a charity generates revenue does not necessarily destroy its charitable nature. *YMCA* illustrates that charitable organizations may generate revenue, yet maintain a charitable nature. In *YMCA*, we considered whether the Young Men's Christian Association of Chicago was subject to a tax levied on its personal property, including the cafeteria, the newsstand, and the laundry, all located within the hotel it operated. Pursuant to the Illinois Constitution, the YMCA claimed that it was exempt from taxation. Ill. Const. 1848, art. IX, § 3. The parties agreed that the YMCA was a charitable organization engaged in charitable work, rather than engaged in the business of making a profit. The issue, however, was whether the operation of the hotel was *ultra vires* its corporate powers and not a charitable undertaking because the guests were charged money to occupy the rooms and the hotel generated a profit from the rent. This court held that the personal property was exempt from taxation because the rate charged was necessary to achieve the corporate purpose—a purpose deemed charitable.

" 'Charity,' in law, is not confined to the relief of poverty or distress or to mere almsgiving but embraces the improvement and promotion of the happiness of man. A charity is a gift to the general public use which extends to the rich as

well as to the poor. The principal and distinctive features of a charitable organization are that it has no capital stock and no provision for making dividends or profits for private gain. It derives its funds mainly from public and private charity and holds them in trust for the objects and purposes expressed in its charter. The charitable nature of an organization depends upon whether its object is to carry out a purpose recognized in law as charitable, or whether it is maintained for gain, profit or private advantage. An institution does not lose its charitable character by reason of the fact that the recipients of its benefits who are able to pay are required to do so, where no profit is made by the institution and the amounts so received are applied in furthering its charitable purposes \*\*\*. The reason for exemptions in favor of charitable institutions is the benefit conferred upon the public by them, and a consequent relief, to some extent, of the burden upon the State to care for and advance the interest of its citizens." *YMCA*, 365 Ill. at 122.

We are further guided by *Akron Golf Charities, Inc. v. Limbach*, 34 Ohio St. 3d 11, 516 N.E.2d 222 (1987). Akron Golf Charities, Inc., organized and promoted a professional golf tournament for charitable purposes. Its articles of incorporation provided that all revenue raised by the corporation be distributed to charitable organizations, with the exception of amounts spent on operating expenses and an amount held in a contingency fund. The lower court considered whether the organization was entitled to an exemption from the sales and use tax and held that the organization was subject to taxation because it was not operated exclusively for charity. According to the lower court, the organization was "in the business of staging a golf tournament and that, of course, the golf tournament itself is a profit-making endeavor." *Akron*, 34 Ohio St. 3d at 13, 516 N.E.2d at 224. The Ohio Supreme Court disagreed, stating that "[t]o suggest that Charities has the status of a 'business' solely because it staged a major golf tournament simply ignores the fact that the golf tournament is nothing more than a means

to a charitable end." *Akron*, 34 Ohio St. 3d at 13, 516 N.E.2d at 225. The court further observed:

"We would agree that the activities of professional golfers do not suggest a charitable purpose, as these players are well and duly compensated for their competitive skills. However, to hold that a golf tournament—or any other method used to raise funds for a clear charitable purpose—is a taxable event would fly in the face of the reason the General Assembly granted the tax exemption in the first place. The exemption's clear purpose is to give encouragement and support to nonprofit organizations that contribute to charitable efforts to alleviate illness, improve education, or disseminate scientific and technological knowledge primarily for the public. *** [In this case] Charities is not selling its services to charitable organizations. Charities' mission is the giving away of its net revenues to charity." *Akron*, 34 Ohio St. 3d at 14, 516 N.E.2d at 225-26.

Silvis argues that our decision is better guided by the Pennsylvania court's decision in *Betsy King LPGA Classic, Inc. v. Township of Richmond*, 739 A.2d 612 (Pa. 1999). However, we find the case inapposite. In *Betsy King*, the court considered whether a professional golf tournament was exempt from local amusement tax under Pennsylvania law. The golf tournament generated $1,804,090 and allegedly contributed to charity $340, although the record did not demonstrate that the $340 was received by a legally recognized charitable organization. The court examined whether the tournament was exempt using a five-prong common law test set forth by the Pennsylvania Supreme Court. Under Pennsylvania law, an organization was tax exempt only if it satisfied all five prongs. The tournament was required to establish that it "donates or renders gratuitously a substantial portion of its services" and "benefits a substantial and indefinite class of persons who are legitimate subjects of charity." *Betsy King*, 739 A.2d at 614. Further, the Pennsylvania Department of Revenue regulations govern-

ing tax exemptions explicitly addressed a factually similar scenario and deemed the event a "noncharitable fund-raising event":

"An organization which exists for the primary purpose of sponsoring athletic events hires a promoter to run a professional golf tournament. The money raised by the event is used to pay the promoter for his services or to pay the event participants with any remaining funds distributed to exempt organizations. This is a noncharitable fund-raising event." *Betsy King*, 739 A.2d at 615.

Pursuant to the Revenue regulation and the common law test, the court held that the tournament's primary purpose was to operate the event and that the charitable purpose was incidental such that it was not entitled to an exemption. The court held that the $340 donation did not satisfy the "substantial portion" requirement, nor did the record show that the amount was received by a "legitimate subject of charity." *Betsy King*, 739 A.2d at 615. We are not governed by a similar regulation or a five-prong analysis, nor are we convinced the facts contain sufficient, if any, similarities to merit further comparison.

We further find the trial court's reliance on *City of Chicago v. Severini*, 91 Ill. App. 3d 38 (1980), misplaced. In *Severini*, the appellate court considered whether a strip club, Candy Club, Inc., was a private place or a "place of public amusement" and, if the latter, required to obtain an amusement license. A municipal ordinance prohibited the operation of an amusement "for gain or profit" without first having obtained a license for public amusement. *Severini*, 91 Ill. App. 3d at 42. The defendants argued that they did not operate the club for gain or profit. To support this defense, they introduced not-for-profit articles of incorporation. The appellate court stated that a mere declaration that the business was not-for-profit was insufficient; courts must examine the individual facts in each case.

" ' "The fact, that a corporation is one not for profit, does not mean that its enterprises may not be conducted for gain, profit or net income. It is necessary to distinguish between gain, profit or net income to the incorporators or members and gain, profit or net income to the corporation as a legal entity. For example, there may be a nonprofit corporation, if there is no purpose of pecuniary gain or profit to the incorporators or members, and yet such a corporation may still be conducted for gain, profit or net income to the corporation as a legal entity." ' " *Severini*, 91 Ill. App. 3d at 44, quoting *State ex rel. Johnson v. Lally*, 59 Wash. 2d 849, 854, 370 P.2d 971, 974 (1962), quoting *American Jersey Cattle Club v. Glander*, 152 Ohio St. 506, 510, 90 N.E.2d 433, 435 (1950).

The appellate court first observed that the club was open to the general public and that it generated revenue by charging a "membership fee" and a standard table charge each time a patron entered the club. *Severini*, 91 Ill. App. 3d at 41. The appellate court also noted that "[n]either the club's articles of incorporation nor its membership policy indicate in any manner that profit or gain to defendants was not intended or permissible, or that none would be accepted." *Severini*, 91 Ill. App. 3d at 45. Rather, the articles of incorporation provided for unlimited powers in the transaction of business, with no limitation on the corporation regarding its ability to make and retain gain, profit, or income. *Severini*, 91 Ill. App. 3d at 44. These facts demonstrated that the club operated "for gain." *Severini*, 91 Ill. App. 3d at 45.

Guided by the appellate court's analysis in *Severini*, the trial court held that the Open was conducted "for gain *** to the corporation as a legal entity" because the Open maintained a one-year reserve fund and the accumulated earnings to fund the tournament each year. Silvis also urges that *Severini* is authoritative, arguing in its brief that "*Severini* makes clear that success in achieving a gain or profit is immaterial if the *intent* is present, and that gain or profit is to be measured by

looking at the (sponsoring) corporation *itself* as opposed to the irrelevant issue of whether gain or profit is ultimately *distributed* (or not) from the corporation to any other person or entity." (Emphases in original.)

Silvis and the trial court overlook an important distinction. In *Severini*, the appellate court stated that "[n]o competent evidence was presented to rebut the reasonable inference that this amusement was presented other than as a business enterprise for profit or gain." *Severini*, 91 Ill. App. 3d at 45. The club was not organized for a charitable purpose, and the word "charity" is absent from the opinion. Rather, the facts suggest that the club was organized as a not-for-profit on false pretenses. Silvis extracts language from *Severini* to argue that the nonprofit nature of an organization is immaterial. There is, however, no comparison to be made between the operations of the strip club and the Open. The holding does not guide our analysis here.

Having decided that "for gain" as it is used in the Illinois Municipal Code does not include events organized and operated for charitable purposes, we next examine whether the Open is operated for a charitable purpose. The purpose of summary judgment is not to try a question of fact, but to determine whether one exists. Summary judgment is proper where the pleadings, depositions, admissions, and affidavits on file, when viewed in the light most favorable to the nonmoving party, reveal that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 2002). We review *de novo* an order granting summary judgment. *City of Chicago v. Holland*, 206 Ill. 2d 480, 487 (2003).

Silvis argues that the "exceedingly small fraction" of actual revenue donated to charity—7% of the revenue raised between 1998 and 2000—renders the charitable purpose incidental such that it is not "operated" for a

charitable purpose. A charity is not defined by percentages, and a charity does not lose its charitable character because it intends to generate a profit. Although a charity may be profit-driven, the relevant inquiry is who profits: "distinctive features of a charitable organization are that it has no capital stock and no provision for making dividends or profits for *private gain*." (Emphasis added.) *YMCA*, 365 Ill. at 122. Charitable events often demand that a portion of the revenue be devoted to overhead costs in order to make the event possible. As noted by the court in *Akron*, a professional golf event demands payment to the participants. Absent prize money to the participants the event would not exist. Simply stated, the payment to players is an operating expense. This does not diminish the charitable purpose of an organization. Like the Ohio Supreme Court in *Akron*, we find that the event is nothing more than a means to a charitable end. The Open is not conducted for private profit or gain. Charities in the Quad Cities area, however, profit tremendously: between 1998 and 2000 the Open contributed $1,078,397 to legitimate Quad Cities area charities, and the Birdies for Charity contributed $2,406,651.22.

The Open's articles of incorporation state the purpose of the organization: "[t]o sponsor a professional golf tournament *** *with the specific purpose* that all profits in excess of a one-year operating contingency fund *** be used in promoting the common good and general welfare of the people of the Quad Cities area." (Emphasis added.) The tournament is a means to achieve that end. The record demonstrates that the Open does, in fact, contribute net revenue to recognized charities. The record also demonstrates that, with the exception of the tournament director, no officer or director is paid for his or her services. There is no profit for private gain. Therefore, we agree with the appellate court that the Open is oper-

ated for a charitable purpose and its gross receipts may not be taxed by Silvis.

### CONCLUSION

For the aforementioned reasons, we affirm the judgment of the appellate court.

*Affirmed.*

JUSTICE KILBRIDE took no part in the consideration or decision of this case.