# Illinois Official Reports

## Appellate Court

> ### *Ford Motor Co. v. Chicago Department of Revenue*,
> ### 2014 IL App (1st) 130597

| | |
|---|---|
| Appellate Court Caption | FORD MOTOR COMPANY, Plaintiff-Appellee, v. CHICAGO DEPARTMENT OF REVENUE, BEA REYNA-HICKEY, in Her Capacity as Director of the Chicago Department of Revenue, and THE CHICAGO DEPARTMENT OF ADMINISTRATIVE HEARINGS, Defendants-Appellants. |
| District & No. | First District, Fifth Division<br>Docket No. 1-13-0597 |
| Filed | June 27, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court's decision that plaintiff car maker was not liable for defendant city's municipal tax on all of the motor vehicle fuel, including gasoline and diesel it purchased for its newly manufactured cars, was reversed by the appellate court, notwithstanding plaintiff's contention that it only used a small percentage of the fuel in testing its new cars and then charged its dealers for the balance of the fuel, since under the terms of the tax ordinance, plaintiff was making "use" of the fuel and was liable for the tax when it was placed in the tanks of the individual cars coming off the assembly lines, regardless of where or when the fuel was ultimately used in the cars or when the cars were sold to dealers; furthermore, plaintiff did not qualify for any of the exemptions in the ordinance. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-L-51361; the Hon. Margaret A. Brennan, Judge, presiding. |
| Judgment | Circuit court reversed; administrative agency affirmed. |

| Counsel on Appeal | Stephen R. Patton, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper, and Stephen G. Collins, Assistant Corporation Counsel, of counsel), for appellants. |
| | |
| | Fred O. Marcus and David S. Ruskin, both of Horwood Marcus & Berk Chtrd., of Chicago, for appellee. |
| | |
| | |
| Panel | JUSTICE McBRIDE delivered the judgment of the court, with opinion. |
| | Presiding Justice Gordon and Justice Taylor concurred in the judgment and opinion. |

# OPINION

¶ 1    The issue on appeal is whether Ford Motor Company is liable to the City of Chicago for a tax of $0.05 per gallon for all the fuel the car maker purchased and put into cars it made in Chicago between 2002 and 2008. A local ordinance provides, "A tax is hereby imposed upon the privilege of purchasing or using, in the City of Chicago, vehicle fuel purchased in a sale at retail" and defines " '[u]se' " to include dispensing fuel into a vehicle's full tank and " '[s]ale at retail' " as "any sale to a person for that person's use or consumption and not for resale to another." Chicago Municipal Code §§ 3-52-020, 3-52-010(B)(9), (8) (added Sept. 24, 1986). The car maker contends the tax is due on only 2% of the gasoline and diesel it purchased from a Chicago fuel distributor because that is the amount used to test run and relocate cars at the Chicago manufacturing plant and the other 98% was neither used nor consumed when it left Chicago in the tanks of cars transported to car dealerships that were billed for the fuel. An administrative law judge determined that the tax applied to 100% of the fuel because "use" occurred when the fuel was dispensed into the new vehicle tanks, but the circuit court of Cook County reversed that determination, and the municipality now appeals from the court's ruling.

¶ 2    Ford Motor Company, a Delaware corporation headquartered in Dearborn, Michigan, manufactures some of its automobiles in Chicago and ships these products to car dealers throughout the United States. For the six-year period at issue, fuel maker BP Amoco, which is registered with the City of Chicago (City) as a fuel distributor, delivered about 10,000 gallons of gasoline and diesel per month to the Ford Motor Company facility and did not assess municipal fuel taxes on the deliveries. Ford Motor Company self-assessed and reported fuel taxes to the City only for a small percentage of the fuel it received from BP Amoco and remitted $19,658.08 to the municipality. After an audit, the department of revenue of the City of Chicago (Department) determined Ford Motor Company owed back taxes totaling $356,675.13, and when the car maker declined to pay the assessment, the

- 2 -

Department assessed interest and penalties, bringing the total amount due to $665,539.85. Ford filed a protest and petition for hearing before the Department and filed a separate protest and petition for a refund of the taxes it had paid.

¶ 3    The two protest actions were consolidated before the administrative law judge (ALJ or hearing officer). Some of the materials submitted to the ALJ included the affidavit of Dennis Curlew, an employee of the car maker, who stated that the company charged car dealerships for the fuel that was put in the tanks of cars delivered to them, and the affidavit of Elaine Herman, an audit supervisor at the Department, who stated that no Ford dealership in Chicago had collected and remitted fuel taxes paid by car buyers or independently paid the fuel taxes to the City.

¶ 4    The ALJ determined the tax applied to all the fuel placed in the new vehicles and entered summary judgment for the Department, based on the ALJ's finding that Ford Motor Company "used" all of the fuel, within the meaning of the municipal tax ordinance, when it dispensed fuel into the tanks of its vehicles. Thus, even if Ford Motor Company purported to resell the fuel when it delivered the new cars to its dealerships, the car maker was already liable for the City's tax. The ALJ rejected the company's contention that it qualified for at least one of the seven exemptions listed in the municipal tax ordinance. See Chicago Municipal Code § 3-52-110 (added Sept. 24, 1986). Two of these were rejected on the merits–the sale of vehicle fuel by a distributor "*to a distributor or retailer of vehicle fuel* whose place of business is outside the city" (emphasis added), and "[t]he sale or use for purpose other than for propulsion or operation of a vehicle." Chicago Municipal Code § 3-52-110(b), (c) (added Sept. 24, 1986). The third exemption–that taxation would violate the United States Constitution–was an argument that the ALJ properly declined to address because an administrative agency lacks authority to declare a statute unconstitutional, or even to question its validity, but a litigant must present its constitutional argument on the record at the administrative stage in order to preserve the issue for subsequent proceedings. Chicago Municipal Code § 3-52-110(e) (added Sept. 24, 1986); *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 214, 886 N.E.2d 1011, 1020 (2008) (an administrative agency lacks authority to resolve a constitutional argument, but procedural default occurs when a party does not first present its constitutional argument in that forum and develop the issue fully for the purposes of administrative review); *Smith v. Department of Professional Regulation*, 202 Ill. App. 3d 279, 287, 559 N.E.2d 884, 889 (1990) (raising a constitutional issue for the first time in the circuit court is insufficient). For all these same reasons, the ALJ rejected the request for a tax refund. After determining the car maker was liable for the tax, the ALJ then considered and affirmed the assessment of interest and a late penalty and negligence penalty which roughly doubled Ford Motor Company's tax debt. When Ford Motor Company sought administrative review in the circuit court, the judge was persuaded by the argument that the car maker had stored unused fuel in the tanks of cars delivered to its dealers and that the Department's decision to the contrary must be reversed. In this appeal, the Department contends the ALJ's conclusions were sound and should be affirmed.

¶ 5    Our role is to review the decision of the administrative agency rather than the decision of the circuit court (*West Belmont, L.L.C. v. City of Chicago*, 349 Ill. App. 3d 46, 49, 811 N.E.2d 220, 224 (2004)) and we address the interpretation of a municipal ordinance *de novo* (*West Belmont*, 349 Ill. App. 3d at 49, 811 N.E.2d at 224). When construing an ordinance, we

- 3 -

follow the same rules that govern the construction of a statute. *County of Montgomery v. Deer Creek, Inc.*, 294 Ill. App. 3d 851, 856, 691 N.E.2d 185, 189 (1998). The objective of statutory construction is to ascertain and give effect to the drafter's intent. *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 279, 786 N.E.2d 139, 150 (2003); *County of Knox ex rel. Masterson v. The Highlands, L.L.C.*, 188 Ill. 2d 546, 556, 723 N.E.2d 256, 263 (1999). We study the language of a challenged statute, as it is usually " 'the most reliable indicator of the legislature's objectives in enacting a particular law.' " *Cryns*, 203 Ill. 2d at 279, 786 N.E.2d at 151 (quoting *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 504, 732 N.E.2d 528, 535 (2000)); *County of Knox*, 188 Ill. 2d at 556, 723 N.E.2d at 263. If the language of a statute is plain, clear and unambiguous, it becomes our sole basis for discerning the intent of the legislative body and we do not need to resort to other principles of statutory construction. *Gem Electronics of Monmouth, Inc. v. Department of Revenue*, 183 Ill. 2d 470, 475, 702 N.E.2d 529, 532 (1998); *County of Knox*, 188 Ill. 2d at 556, 723 N.E.2d at 263. We are never at liberty to depart from the plain language and meaning of a statute by reading into the law an unstated exception, limitation, or condition. *Gem Electronics*, 183 Ill. 2d at 475, 702 N.E.2d at 532; *County of Knox*, 188 Ill. 2d at 556, 723 N.E.2d at 263. Furthermore, we should not adopt a construction that renders words or phrases superfluous. *County of Montgomery*, 294 Ill. App. 3d at 856, 691 N.E.2d at 189. While on the one hand, a taxing law will be strictly construed against the taxing body and in favor of the taxpayer, on the other hand, language that provides an exemption is strictly construed in favor of the taxing body and against the taxpayer and the taxpayer bears the burden of proving entitlement to the exemption. *Gem Electronics*, 183 Ill. 2d at 475, 702 N.E.2d at 532. These principles lead us to affirm the Department's decision in favor of taxation of 100% of the fuel at issue.

¶ 6      The ordinance, in plain and clear language, unambiguously provides, "A tax is hereby imposed upon the privilege of purchasing or using, in the City of Chicago, vehicle fuel purchased in a sale at retail." Chicago Municipal Code § 3-52-020 (added Sept. 24, 1986). The facts before us indicate Ford Motor Company purchased and used in the City of Chicago all of the fuel that it received from BP Amoco at the Chicago car assembly plant, as the ordinance defines those terms, and thus subjected itself to taxation. According to the ordinance adopted by city council, " 'purchase ' means any transfer of ownership or title or both, any exchange or any barter, whether conditional or otherwise, in any manner or by any means whatsoever for consideration." Chicago Municipal Code § 3-52-010(B)(7) (added Sept. 24, 1986) (definition of sale, resale, and purchase). According to the ordinance, " 'Use' means the exercise of any right to or power over vehicle fuel incident to the ownership thereof, including but not limited to, the receipt of vehicle fuel by any person into a fuel supply tank of a vehicle." Chicago Municipal Code § 3-52-010(B)(9) (added Sept. 24, 1986). And, according to the ordinance, " 'Sale at retail' means any sale to a person for that person's use or consumption and not for resale to another." Chicago Municipal Code § 3-52-010(B)(8) (added Sept. 24, 1986). The ordinance also specifies that taxable " '[u]se in the city' shall be deemed to occur only at the place in the city where the vehicle fuel is transferred into the vehicle by which it is to be consumed." Chicago Municipal Code § 3-52-030 (added Sept. 24, 1986). We find the meaning of this ordinance to be clear and certain, rather than ambiguous and susceptible to two or more reasonable interpretations.

¶ 7 The record indicates that BP Amoco made monthly deliveries of gasoline and diesel fuel to large storage tanks at Ford Motor Company's Chicago assembly plant and gave up ownership of its product. Because both BP Amoco and Ford Motor Company were registered with the City as fuel distributors, the monthly deliveries could have been transfers of product from one distributor to another, which are transactions that are not addressed by the ordinance at issue. According to the ordinance, a distributor is:

> "any person who produces, refines, blends, compounds or manufactures vehicle fuel in the city; *** or has transported vehicle fuel to any location in the city, or receives in the city vehicle fuel, on which the Chicago Vehicle Fuel Tax has not been paid; or sells vehicle fuel to a retail dealer for resale in the city. 'Distributor' shall not include any person who transports vehicle fuel into the city or receives vehicle fuel in the city for his own use and consumption, and not for sale or resale." Chicago Municipal Code § 3-52-010(B)(4) (added Sept. 24, 1986).

¶ 8 The ordinance puts the burden on Ford Motor Company to show that the tax does not apply to the fuel it bought from BP Amoco. The ordinance specifies, "It shall be presumed that all sales and uses of vehicle fuel in the city are subject to tax under this chapter until the contrary is established. The burden of proving that a sale or use is not taxable hereunder shall be upon the distributor, retail dealer, purchaser, or user so claiming." Chicago Municipal Code § 3-52-100 (added Sept. 24, 1986).

¶ 9 The question is whether after BP Amoco delivered the fuel, the car maker subsequently "exercise[d] *** any right to or power over [the] vehicle fuel incident to the ownership thereof," such as by dispensing it "into a fuel supply tank of a vehicle" (Chicago Municipal Code § 3-52-010(B)(9) (added Sept. 24, 1986)) in the City of Chicago or otherwise making "use or consumption" of it in the City of Chicago before transporting it offsite in the tanks of new cars destined for dealerships (Chicago Municipal Code § 3-52-010(B)(9) (added Sept. 24, 1986)). If the answer to this question is affirmative, then Ford Motor Company is liable for the City's fuel tax.

¶ 10 The answer to this question is definitely "yes," because, according to the plain terms of the ordinance, when Ford Motor Company transferred the fuel from its large holding tanks into the individual tanks of new vehicles rolling off its assembly line, Ford Motor Company was making "use" of the fuel, regardless of where or when the fuel was ultimately burned to operate the new vehicles, or where or when the vehicles were delivered or sold to a dealership. The ordinance plainly and clearly specifies that the tax is triggered by dispensing fuel into a vehicle's fuel tank, which Ford Motor Company routinely and repeatedly did. Ford Motor Company is like the individual consumer who fills his or her car's tank at a Chicago gas station and pays the local fuel tax at that time, regardless of whether he or she burns some of the dispensed fuel by driving outside of Chicago. The ordinance does not impose the tax based on where a vehicle consumes the fuel; rather, the ordinance taxes the "use" of fuel and specifies that "use" includes dispensing fuel into a vehicle's tank. As a car maker, Ford Motor Company handled many more vehicles and many more gallons of fuel than any individual consumer, but the car maker and our hypothetical consumer have done the same thing with the gasoline and diesel fuel they received–they used it. And, because a " '[s]ale at retail' " is defined as "any sale to a person for that person's use or consumption and not for resale to another" (Chicago Municipal Code § 3-52-010(B)(8) (added Sept. 24, 1986)), the record indicates Ford Motor Company participated in a series of " 'sale[s] at

retail' " and became liable for the municipal tax. That is the conclusion drawn by the ALJ and it was the correct one.

¶ 11    Ford Motor Company contends this conclusion is incorrect, however, because 98% of the fuel delivered by BP Amoco was purchased for "resale to another," namely, its new car dealerships, and, therefore, could not be treated as a taxable "sale at retail." Chicago Municipal Code § 3-52-01(B)(8) (added Sept. 24, 1986). This conclusion, however, is unsound. It would require us to ignore the ordinance's plain statement that dispensing fuel into a vehicle's tank is a taxable use of the fuel. See Chicago Municipal Code § 3-52-010(B)(9) (added Sept. 24, 1986) (indicating taxable use of fuel "means the exercise of any right to or power over vehicle fuel incident to the ownership thereof, including but not limited to, the receipt of vehicle fuel by any person into a fuel supply tank of a vehicle"). It is not appropriate for us to disregard any part of this concise and clear ordinance. *County of Montgomery*, 294 Ill. App. 3d at 856, 691 N.E.2d at 189 (indicating words and phrases should not be rendered superfluous).

¶ 12    Furthermore, if Ford Motor Company was truly buying fuel for resale, then we would expect it to charge its customers for the amount of fuel that it delivered to them, but the record does not bear this out. The record contains one sample invoice for a new car that Ford Motor Company delivered to a dealership in Auburn, Washington, in 2003. The invoice includes a line item charge for exactly 10 gallons of fuel. Curlew, the Ford Motor Company employee, stated in his affidavit that "all Dealers were required to pay the full charge for vehicle fuel placed in motor vehicles referenced on the Dealer Invoices," but he did not say that the amounts referenced on the invoices corresponded with the amount actually in the tanks at the time of delivery. This leads to the inference that the amount of fuel stated on the invoice corresponded with the amount of fuel that Ford Motor Company initially dispensed into its cars, before consuming some of the fuel by test running and driving the cars onto trucks for delivery. In other words, the amount invoiced was to reimburse Ford Motor Company for fuel that it purchased and used to produce and prepare its new cars for delivery, and the invoice does not reflect a sale from a fuel distributor to a fuel retailer. Ford Motor Company did not meet its burden of showing that it acted as a fuel distributor. The record indicates Ford Motor Company is a car maker that invoices its retail dealers for the production and preparation of cars. Ford Motor Company is not a fuel seller. It did not obtain the fuel at issue in order to resell the fuel to its retail car dealers. For the purposes of the local ordinance, the Chicago car maker had already "used" the fuel at issue by dispensing it into vehicles before shipping them to dealerships. Thus, Ford Motor Company is liable for the municipal tax at issue.

¶ 13    In addition, the Department has also pointed out the fallacy in the circuit court's remark that reading the ordinance as we do makes "*any* transfer of fuel *** become a taxable transaction as long as the fuel was placed in a storage tank under the buyer's control, regardless if the fuel was ultimately resold to another party for *their* use." (Emphases in original.) This concern is unfounded, as the ordinance does not apply to exercising control over fuel in a storage tank. As set out above, the ordinance taxes the "purchasing or using [of vehicle fuel], in the City of Chicago" (Chicago Municipal Code § 3-52-020 (added Sept. 24, 1986)) and plainly states that "use in the city" occurs where fuel is put "into the vehicle by which it is to be consumed" (Chicago Municipal Code § 3-52-030 (added Sept. 24, 1986)). Ford Motor Company subjected itself to the local tax when it put fuel into the tanks of its

vehicles in Chicago–vehicles which would consume the fuel rather than simply act as storage containers. The circuit court's reading would improperly broaden the scope of the ordinance beyond the drafter's intent.

¶ 14    Also, none of the claimed exemptions is applicable to Ford Motor Company's use of the fuel. A statute providing for exemption is strictly construed in favor of taxation and against exemption. *West Belmont*, 349 Ill. App. 3d at 49, 811 N.E.2d at 224 (regarding whether townhome developer's purchase of land which had been used by furniture retailer and rental company was exempt from municipal transfer tax on commercial or industrial property); *Quad Cities Open, Inc. v. City of Silvis*, 208 Ill. 2d 498, 507, 804 N.E.2d 499, 505 (2004) (regarding whether charitable golf tournament was exempt from municipality's amusement tax). Ford Motor Company has the burden of proving it is entitled to an exemption (*West Belmont*, 349 Ill. App. 3d at 49, 811 N.E.2d at 224; *Quad Cities Open*, 208 Ill. 2d at 507, 804 N.E.2d at 505), and its burden is a challenging one because "all debatable questions are resolved in favor of taxation" (*Yale Club of Chicago v. Department of Revenue*, 214 Ill. App. 3d 468, 472, 574 N.E.2d 31, 33 (1991)). Even if the standard for establishing an exemption was lenient and favorable to the taxpayer, we would rule against Ford Motor Company.

¶ 15    Its first and third exemption claims require us to disregard city council's unequivocal indication that dispensing fuel into a vehicle's tank is a taxable "use" of the fuel. See Chicago Municipal Code § 3-52-010(B)(9) (added Sept. 24, 1986).

¶ 16    In order to qualify for the first exemption, Ford Motor Company could not "use" the fuel and instead would have to be a fuel distributor and its car dealerships would have to be either fuel distributors or fuel retailers. The municipal ordinance exempts from taxation any "[s]ale by a distributor to a distributor or retailer of vehicle fuel whose place of business is outside the city." Chicago Municipal Code § 3-52-110(b) (added Sept. 24, 1986). The ordinance specifies that the term " '[d]istributor' shall not include any person who transports vehicle fuel into the city or receives vehicle fuel in the city for his own use and consumption, and not for sale or resale." Chicago Municipal Code § 3-52-010(B)(4) (added Sept. 24, 1986). The record indicates that although Ford Motor Company is registered as a fuel distributor of vehicle fuel in Chicago, Ford Motor Company was not acting like a distributor with respect to the vehicle fuel at issue. Ford Motor Company made "use" of the fuel it received from BP Amoco and it cannot claim the benefit of this exemption. Furthermore, treating Ford Motor Company as a distributor of vehicle fuel and its dealerships in Chicago as retailers of vehicle fuel would mean that the car maker should have collected the tax from its dealerships or that the dealerships should have "collect[ed] the tax from the purchaser[s] of the vehicle fuel," which would be the car buyers. Chicago Municipal Code § 3-52-040(A) (added Sept. 24, 1986). However, Ford Motor Company presented no evidence that the tax was collected and did not attempt to rebut the sworn statement of Elaine Herman, an audit supervisor at the Department, that no Ford dealership in Chicago had collected and remitted fuel taxes paid by car buyers or independently paid the fuel taxes to the city for the six-year period at issue. Ford Motor Company was not entitled to the first exemption it claimed.

¶ 17    Similarly, in order to qualify for the third exemption, Ford Motor Company would have to establish that (1) it did not "use" the vehicle fuel within the meaning of the ordinance, (2) it instead purchased the fuel for nonretail sales to its dealers, and (3) 98% of the fuel it bought was then sold to dealers outside of Chicago. After establishing all these facts, Ford Motor Company would have to prove its contention that it could be taxed in another

jurisdiction on the non-Chicago sales, which could result in multiple taxation in violation of the Interstate Commerce Clause of the United States Constitution (see *Allied-Signal, Inc. v. Director, Division of Taxation*, 504 U.S. 768, 777-78 (1992)) or its contention that the lack of minimum connection this jurisdiction has over those non-Chicago sales results in taxation that is contrary to the Due Process Clause of the United States Constitution (see *Allied-Signal*, 504 U.S. at 777-78). Proving either of these theories would bring Ford Motor Company's purchases from BP Amoco within the ordinance's exemption for "[s]ale or use to the extent the tax imposed by this chapter would violate the Illinois or United States Constitution." Chicago Municipal Code § 3-52-110(e) (added Sept. 24, 1986). However, the conclusion that we reached above that Ford Motor Company "used" the fuel when it dispensed the fuel into individual vehicle tanks leads us to also conclude that Ford Motor Company cannot prove that enforcement of the tax ordinance is unconstitutional.

¶ 18     The exemption for "[s]ale or use [of vehicle fuel] for purposes other than for propulsion or operation of a vehicle," (Chicago Municipal Code § 3-52-110(c) (added Sept. 24, 1986)), is not available to Ford Motor Company because the obvious and undeniable reason the car maker dispensed the fuel into the individual vehicle tanks was for "propulsion or operation" of its vehicles. Ford Motor Company argues that its purpose was for the subsequent resale of the fuel to vehicle dealerships located inside or outside of Chicago, but we rejected this argument above. The fuel was not placed into storage tanks for resale.

¶ 19     For all these reasons, we find that the municipal tax ordinance applies to Ford Motor Company and that this taxpayer does not qualify for exemption. Accordingly, we reverse the decision of the circuit court in favor of Ford Motor Company and affirm the decision of the administrative law judge in favor of the Department.

¶ 20     Circuit court reversed; administrative agency affirmed.